366 So.2d 1369 (1978)
STATE of Louisiana
v.
Donald WILLIAMS.
No. 62711.
Supreme Court of Louisiana.
December 15, 1978.
*1370 Bernard E. Burk, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Robert T. Myers, Asst. Dist. Atty., New Orleans, for plaintiff-appellee.
DIXON, Justice.
Donald Williams and Johnnie J. Willis were charged with possessing a firearm after having been convicted of a felony, a violation of R.S. 14:95.1. A motion to suppress was denied. At trial Willis withdrew his plea of not guilty and entered a plea of guilty. Williams was convicted and sentenced to serve five years at hard labor.
*1371 On appeal Williams assigns five errors; there is merit in two assignments; we do not reach the others.
Police officers Robert Anderson and Henry Sanderson were on patrol in downtown New Orleans on the evening of February 25, 1978. At approximately 9:25 p. m. they noticed a green 1970 Pontiac without tail lights in the vicinity of Calliope and Carondelet Streets. The officers decided to issue a citation to the driver and turned on their siren and light to notify him to stop. The car was stopped at the corner of Carondelet Street and Howard Avenue next to a large gasoline station, and its two occupants were ordered to get out of the vehicle. As the passenger, Johnnie J. Willis, was getting out, Officer Sanderson noticed a sawed-off shotgun on the floor between the passenger's side of the front seat and the door of the car. Willis and the driver, Donald Williams, were immediately arrested for the possession of the sawed-off shotgun, and Williams was issued citations at Central Lockup[1] for driving without tail lights and without a driver's license.

Assignment of Error No. 1
In his first assignment of error the defendant contends that it was error for the district court to deny the motion to suppress and to admit the evidence at trial.
An important issue at the suppression hearing was the officer's authority to order both the driver and the passenger from the car during a routine traffic stop. The police report of the incident contains the notation that both occupants were ordered from the car because the officers feared for their personal safety. Officer Robert Anderson testified that he could see the occupants of the car well enough to know only that they were black males until they were ordered from the car. Anderson further stated that his partner gave the order as they approached the car, although he later qualified his statement and said that Williams was perhaps already getting out when Sanderson spoke. When asked why both men were asked to get out, Anderson first answered that such was routine procedure. However, he added that a number of factors were taken into account when deciding whether to order both driver and passenger, or either, from the car, such as the time of night, the number of occupants, the fact that they were males, and the absence of other police. Officer Anderson also stated that he and his partner had received a report of an armed robbery involving two black males in that general area, although he remembered no details, and did not stop the car for that reason.
In certain respects Officer Henry Sanderson's testimony differed from that of his partner. Officer Sanderson at one point testified that both officers gave the order, and that Williams got out and approached Anderson. At that point, he stated, he went to the passenger side of the car, and, when Willis opened the door, saw a sawed-off pump shotgun which obviously violated state and federal laws. He then arrested Willis and told Anderson to proceed cautiously with Williams, whom his partner then arrested as well. Under cross-examination, Sanderson stated that they first ordered the driver out of the car and that he then ordered Willis to step out when he recognized Williams from a previous drug arrest. However, Sanderson admitted that he did not know Willis,[2] that Willis had made no threatening gesture to him, and that weapons were not involved in Williams' previous arrest. Both officers agreed that they were not investigating a crime and that they had no reason to suspect either Williams or Willis of any infraction other than the traffic offense.
Johnnie Willis, the passenger in Williams' car, also gave his version of the events in question. According to his testimony, Williams was already out of the car and talking to one of the officers when the other came *1372 to the passenger window, knocked on it to get his attention, and ordered him to get out. He was then told to go to the rear of the vehicle where Williams and the other officer were standing. As he was going there, both he and Williams were placed under arrest.
Unreasonable searches and seizures are prohibited by the Fourth Amendment to the United States Constitution and by Article I, § 5 of the Louisiana Constitution. A search conducted without a warrant is presumed unreasonable unless it is justified by one of the narrowly drawn exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); State v. Colvin, 358 So.2d 1250 (La.1978); State v. Parker, 355 So.2d 900 (La.1978). When the constitutionality of a warrantless search is at issue on a motion to suppress, the state bears the burden of affirmatively showing that it was justified under one of these exceptions. State v. Adams, 355 So.2d 917 (La.1978); State v. Franklin, 353 So.2d 1315 (La.1977).
The prosecution relies on the "plain view" doctrine as an exception to the prohibition against warrantless searches and seizures.[3] The elements of this exception were laid out by the United States Supreme Court in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Three conditions must be present for the exception to apply: (1) a prior justification for the intrusion into the protected area; (2) in the course of which the evidence is discovered inadvertently; (3) where it is immediately apparent without close inspection that the items are contraband or evidence. See also, State v. Parker, supra; State v. Fearn, 345 So.2d 468 (La. 1977).
To meet this first requirement the state argues that a police officer may order both passenger and driver from the automobile during a routine traffic stop where there is no reason to believe either one has committed a crime or is dangerous. The purported justification for this seizure of the person is to protect the police officers from personal injury perpetrated by the occupants of the car. Support for this position is said to be found in the recent cases of Foley v. Connelie, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) and Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). The following statement from Foley, supra, is cited by the prosecution in support of its argument:
"An arrest, the function most commonly associated with the police, is a serious matter for any person even when no prosecution follows or when an acquittal is obtained. Most arrests are without prior judicial authority, as when an officer observes a criminal act in progress or suspects that felonious activity is afoot. Even the routine traffic arrests made by the state trooperfor speeding, weaving, reckless driving, absence of license plates or outdated license plates, absence of inspection stickers, dangerous physical condition of a vehicle, to describe only a few of the more obvious common violations can intrude on the privacy of the individual. In stopping cars, they may, within limits, require a driver or passengers to disembark and even search them for weapons, depending on time, place and circumstances. That this prophylactic authority is essential is attested by the number of police officers wounded or killed in the process of making inquiry in borderline, seemingly minor violation situationsfor example, where the initial stop is made for a traffic offense but, unknown to the officer at the time, the vehicle occupants are armed and engaged in or embarked on serious criminal conduct." 435 U.S. 291, 298, 98 S.Ct. 1067, 1071, 55 L.Ed.2d 287, 293.
Foley v. Connelie was a civil action in which a resident alien attacked a state law limiting *1373 state police appointments to citizens. It did not hold that police may require passengers to disembark on traffic stops, and the statement relied on by the prosecution is clearly obiter dictum.
More to the point, however, is the prosecution's argument that the result of the balancing of individual privacy interests and of the state's concern for the officer's safety conducted in Pennsylvania v. Mimms, supra, applies with equal weight to the instant case. In Mimms, the Supreme Court held that a police officer's order to a driver to get out of his car did not violate the Fourth Amendment, even though the officer had no reason to suspect foul play from the particular driver. In reaching this conclusion, the court first stated that the state's justification for the intrusion, the personal safety of the officer, was both legitimate and weighty, and cited a study showing 30% of all police shooting to have occurred when the officer approached a person seated in an automobile. The court also noted the hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle.
When it turned to the invasion of privacy suffered by the motorist, the court stated:
"Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. We think this additional intrusion can only be described as de minimis. The driver is being asked to expose to view very little more of his person than is already exposed. The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it. Not only is the insistence of the police on the latter choice not a `serious intrusion upon the sanctity of the person,' but it hardly rises to the level of a `petty indignity.' Terry v. Ohio, [392 U.S. 1] supra, at 17, 88 S.Ct. 1868, 20 L.Ed.2d 889. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337 (1977).
The state argues that the same considerations are at play in the instant situation: a well justified concern for the police officer's safety and a minimal intrusion on individual liberty. However, the ruling sought by the state is not a logical extension of the Supreme Court's rationale in Pennsylvania v. Mimms, supra.
It is first questionable to what degree an officer is placed in danger when he stops a person for a routine traffic offense. Justice Stevens in dissent in Mimms points out that the study relied on by the majority does not differentiate the stops made due to traffic offenses rather than pursuant to more serious matters. Within the group of the thirty-five cases mentioned[4] were disparate factual situationsofficers shot through the windshield or through the car body while their car was still in motion, officers shot while dismounting or approaching the suspect's vehicle, officers shot by passengers. In only twenty-eight of the thirty-five cases was the location of the suspect verified; in only twelve of these cases was the suspect behind the wheel of an automobile, and this number appears to include situations in which the officer was shot before he could order the suspect out of the vehicle. In nine cases, on the other hand, the shooting occurred outside the car while the suspect addressed the officer. 434 U.S. 106, 119, 98 S.Ct. 330, 335, 54 L.Ed.2d 331, 340 (Stevens, J. dissenting).
Moreover, it is also questionable whether ordering the routine traffic offender to get out of his car significantly enhances the safety of the police officer: "Arguably, such an order could actually aggravate the *1374 officer's danger because the fear of a search might cause a serious offender to take desperate action that would be unnecessary if he remained in the vehicle while being ticketed." 434 U.S. at 119, 98 S.Ct. at 337, 54 L.Ed.2d at 340 (Stevens, J., dissenting). In addition, it is noteworthy that some disagreement exists among the authorities over the preferable way to handle the traffic stop situation, with some advising the officer never to let the violator get out of the car. See A. Yount, Vehicle Stops Manual (1976); V. Folley, Police Patrol Techniques and Tactics (1973), cited in Pennsylvania v. Mimms, supra, (Stevens, J. dissenting).
The second justification for ordering the driver from the vehicle is to protect the officer from accidental injury from passing traffic. Although this rationale may have some weight when the officer would otherwise have to speak to the driver through the window on the driver's side, it has no application when the passenger is involved. Not only is the officer less likely to be exposed to traffic if he stands outside the passenger windows on the right side of the car, there is also no need for the officer to speak to the passenger during a routine traffic stop.
In addition, the treatment by the Supreme Court of the intrusion into the driver's personal liberty is not dispositive of the issue at hand. As the court noted, by stopping the automobile the police have decided that the driver will be detained. Such is not the case for the passenger, who has broken no law and who may walk away from the scene unless the police officer has some other legitimate reason to detain him. Certainly the passenger has a higher expectation of privacy than the driver, because the passenger plays no part in the routine traffic infraction and has reason to suppose that any exchange with the authorities will be conducted by the driver alone. To give the police officer the discretion to order the passenger from the automobile without requiring any explanation of the officer's actions (other than a blanket concern for personal safety in all situations) is to abandon the requirement of individualized inquiry into the reasons for an intrusion of the right to privacy secured by Article 1, § 5 of the Louisiana Constitution. (See State v. Kinnemann, 337 So.2d 441 (La.1976). Therefore, without deciding the relationship between the Mimms analysis of the motorist's liberty interest under the Fourth Amendment and the right to privacy under Louisiana Constitution Article 1, § 5, we conclude that the Mimms rationale does not extend to passengers in the automobile. There is no legitimate support in Louisiana for a rule that would permit police to remove a passenger from an automobile on a routine traffic stop.
This assignment of error has merit.

Assignment of Error No. 2
By this assignment of error, the defendant argues that the trial judge committed reversible error by refusing to instruct the jury that the prosecution must prove, as an element of the offense charged, that the defendant had possessed the shotgun within a period of less than ten years from the date of completion of sentence, probation, parole, or suspension of sentence of the felony conviction. In the alternative, the defense argues that if it had the burden of proof on this issue, the burden shifted to the prosecution once the defense offered some evidence that more than ten years had passed.
The statutory language in question provides:
"C. Except as otherwise specifically provided, this Section shall not apply to the following cases:
(1) The provisions of this Section prohibiting the possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies shall not apply to any person who has not been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence." R.S. 14:95.1.
At trial the state argued that the ten year cleansing period was an exception to the statute and not an element of the offense, *1375 thereby making it incumbent on the defendant to prove the lapse of this period of time. An analogy was drawn between the ten year period and the possession of a valid prescription for controlled substances, a defense to a charge of drug possession under R.S. 40:966(C).
Before passing on the merits of this assignment, we note that this appears to be a case of first impression in this and other American jurisdictions. However, this may be due to the absence of a cleansing period in many statutes prohibiting felons from possessing weapons. E. g., A.S. 11.55.030 (Alaska); FSA § 790.23 (Florida); GS § 14-415.1 (North Carolina).
The statutory language is persuasive that possession of the weapon within less than ten years of the earlier felony is an element of the offense and must be proved by the state beyond a reasonable doubt. The statute in question provides "this Section shall not apply to the following cases:", language which completes the definition of the crime. A convicted felon who completed his sentence and supervision is not prohibited from possessing firearms. In proving every element of the offense the state must prove, not only the felony conviction, but the date of completion of the punishment. R.S. 15:271 provides:
"The plea of not guilty throws upon the state the burden of proving beyond a reasonable doubt each element of the crime necessary to constitute the defendant's guilt."
The comparative ease with which the state can prove the date of termination of defendant's sentence is an important consideration. The prosecution is accorded easy access to such information. An indigent defendant seeking to prove a negative (that he is not within a class of felons prohibited from possessing weapons) might face a difficult task of obtaining documentary evidence from distant states. His own testimony, if forced to testify as to the termination date, would be worth little before a jury because of the previous conviction.
For these reasons we hold that the trial judge erred in failing to charge the jury that the state had the burden of proving that the cleansing period had not elapsed, as an element of the offense proscribed by R.S. 14:95.1.
For the reasons assigned, the defendant's conviction and sentence are reversed and the case is remanded to the district court for proceedings consistent with the views expressed herein.
SANDERS, C. J., and SUMMERS and MARCUS, JJ., dissent.
NOTES
[1] A revolver was also seized from the car, but the defendant was never charged with its possession.
[2] At trial Officer Sanderson stated: "We asked Mr. Williams to step out of his vehicle, at which time I recognized Mr. Willis, and asked him to step out of the vehicle also."
[3] In brief the state argues in the alternative that the plain view sighting of the sawed-off shotgun gave the police probable cause to search and that exigent circumstances existed. However, due to our disposition of the "plain view" exception, an analysis of this argument is foreclosed.
[4] The study involved one hundred ten selected police shootings that occurred in 1959, 1960, and 1961. In thirty-five of these cases (32%), officers were attempting to investigate, control or pursue suspects who were in automobiles. Bristow," Police Officer ShootingsA Tactical Evaluation," 54 Crim.L.C. & P.S. 93 (1963).