James **COUSART**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 88–CF–1120.

District of Columbia Court of Appeals.

Argued En Banc March 19, 1992.
Decided Dec. 18, 1992.

---

Jo–Ann Wallace, Public Defender Service, with whom James Klein and Richard S. Greenlee, Public Defender Service, were on the brief, for appellant.

John R. Fisher, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Thomas J. Tourish, Jr. and Gilberto de Jesus, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, WAGNER, KING and SULLIVAN, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

A jury convicted appellant of carrying a pistol without a license, D.C.Code § 22–3204 (1989), and related offenses. Prior to trial, the court refused to suppress as evidence the pistol which the police found wedged between the end of the front seat and the right front door of the auto in which appellant was riding as the front seat passenger.

The dispute in the instant case is not over the lawfulness of the police stop of the auto, which appellant concedes, but the constitutionality of the police command to appellant and the other passenger to raise their hands into view as they remained seated in the auto after a police chase effected its stop at 3:30 of a January morning. The record contains several different descriptions of the command given to the passengers. Essentially, it was to put their hands up where they could be seen.[1]

We affirm.

I.

This court established in *Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc), the proposition that "[i]n reviewing a trial court order denying a motion to suppress, the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling." The record reflects that Officers Massey and Zerega were on duty on January 3, 1988, at 3:30 a.m., when they received and responded to a radio call for help from a fellow officer. They knew that the officer who called for

---

1. Specifically, there was testimony: "[W]ell, we ordered all subjects in the car to raise their hands up" [TR. 10]; the two responding officers "ordered—the subjects in the automobile to put their hands up" [TR. 29]; "We had the persons in the auto place their hands on the head liner on the inside of the car" [TR. 40]; appellant was ordered "to put his hands up" [TR. 49]; "the passengers ... placed their hands where we could clearly see them ... above their heads" [TR. 152]; and "everybody was ordered to put their hands up" [TR. 162].

We note that the hands of persons seated in an auto are out of the sight of police approaching the auto. The hands of the occupants of the auto can be seen from the outside *only* if they are raised into view. Thus, a police command of "hands up" to a person seated in the auto is not a classic arrest "command" as it would be if directed to a person already standing erect.

assistance was pursuing a car but did not know for what reason. As Massey later testified, [TR. 39–40] he had "monitored a Traffic Division cruiser chasing an auto for an unknown reason" [TR. 45] and responded "[t]o assist a fellow officer and to ensure his safety." [TR. 39–40]

After a chase of what amounted to six blocks by the Traffic Division cruiser,[2] the auto finally came to a stop at First Street and New York Avenue, N.W. in a "high drug" area. [TR. 40] Massey and ·Zerega arrived on the scene moments later. The former was carrying a shotgun because of a recent rash of police shootings. They observed Officer Braswell, the officer who had radioed for assistance, exiting his patrol car and approaching the auto in which appellant and two other males were seated. Zerega later testified that as he approached the auto, "[he] advised the occupants [of the auto] to place their hands where we could see them up in the air." [TR. 167] Appellant initially complied, but then immediately dropped his hands, "did something below the dash line ... and dropped his right shoulder down between the seat and the door, and came back up." [TR. 42–43] After appellant dropped his hands, he was ordered to raise them again as Officer Zerega proceeded to open the car door. Appellant was then ordered to exit the car. [TR. 43] The officers discovered a pistol in a brown paper bag, [TR. 10–11, 31] "just inches" from where appellant's hand had been as he sat in the front seat of the car.

The circumstances that had precipitated the chase were later explained in detail by Officer Braswell at the suppression hearing. Braswell testified that while riding in his patrol car he had observed the auto in which appellant was riding make a reckless turn from First Street, N.E. onto New York Avenue [TR. 13, 36–37], and begin to speed away. [TR. 14, 22] Officer Braswell, who was then following the auto, activated his cruiser lights several times, but the auto refused to stop. He further testified

that [TR. 24] "[t]he speed increased much faster as I turned my lights on when it made the turn." Once Braswell "made the determination that [the driver] did not intend to stop ... [Braswell] ... immediately called for some assistance." [TR. 14]

The trial judge, in denying appellant's suppression motion, found [TR. 55, 60]:·

> [T]here is even a little more than just a traffic violation, because he [Officer Braswell] said, and I think reasonably concluded from the actions of the driver ... that the driver was attempting to avoid and flee from the presence of the officer, which adds a little more to the case as compared to the officer just having seen a traffic violation.  * * *  The inference that I draw from the evidence that is unrefuted is that there was an attempt, after the officer [Braswell] pulled his car behind the suspect's car ... to flee.

The court concluded [TR. 71–72]:[3]

> [I]t just seems ... unreasonable ... to hold an officer to a requirement that in reference to the passengers in the car under those circumstances, the officer has to take his risks that those individuals [in the auto] had nothing to do with the driver attempting to flee, and therefore put his life in danger.... [I]t would not be unreasonable to require that the passengers merely raise their hands in the car so that their hands are in sight, while the officer does what he has to do in reference to the driver.

## II.

Appellant asserts that Officer Zerega effected an unreasonable seizure and hence violated the Fourth Amendment to the Constitution when he ordered appellant and the other passenger to keep their hands in view because, as he argued to the trial judge at the hearing on his suppression motion, [TR. 76] "the conduct of the driver ... did not

---

2.  There was testimony [TR. 24] that *each* of the blocks of New York Avenue between First Street, N.E., where the chase began, and First Street, N.W. "are so long that it would be equivalent to three city blocks...."

3.  Contrary to the dissent's suggestion, *see post* at 110, the majority relies upon the trial court's conclusion and findings rather than engaging in fact-finding itself.

provide a reasonable basis for the officer [Zerega] to take any actions with respect to the passengers...." Appellant argues that as a consequence of this unlawful seizure, exacerbated by the fact that Zerega was accompanied by Officer Massey who carried a shotgun, the court should have suppressed the pistol the police recovered from the auto.[4]

The government contends to this court sitting en banc [Petition for Rehearing at p. 4, 6] that

[t]his case is governed by the principles articulated in *Pennsylvania v. Mimms*, 434 U.S. 106 [98 S.Ct. 330, 54 L.Ed.2d 331] (1977), where police officers had made a traffic stop of a vehicle occupied by two individuals. When the driver complied with the command to step out of the car, a pistol was discovered ... the [Supreme] Court did not require a reason to suspect that the particular individual was armed and dangerous. Rather "out of a concern for the safety of the police, the Court ... held that officers may, consistent with the Fourth Amendment, exercise their discretion to require a driver who commits a traffic violation to exit the vehicle even though they lack any particularized reason for believing the driver possesses a weapon." *New York v. Class* 475 U.S. 106, 115 [106 S.Ct. 960, 967, 89 L.Ed.2d 81] (1986) (summarizing the holding in *Mimms*).

The government urges this court in this case to follow what it terms [p. 6] the presently-existing "substantial authority for the proposition that the principle of *Pennsylvania v. Mimms* applies to passengers as well as the driver." However, the instant case, as the trial court found, "involves more than just a traffic violation" since "the driver was attempting to avoid and flee from the presence of the officer." *Mimms* involved a traffic stop without any

indicia of criminal activity. In contrast, this case is *not* a mere traffic violation, and so we must decline the government's invitation to accept and apply the *Mimms* decision to declare that passengers may also be ordered to exit an auto stopped for a traffic violation only.[5] Rather, we view this case as requiring a determination of the reasonableness of the officer's command to the passengers to put their hands up in his view under the particular circumstances.

In the seminal case of *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), the Supreme Court admonished:

[T]he specific content and incidents of [the Fourth Amendment] right must be shaped by the context in which it [was] asserted. For "what the Constitution forbids is not all searches and seizures, but unreasonable searches...." The question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an *unreasonable* search and seizure.

(Emphasis added). In *Terry*, the Court expressly acknowledged that a part of the justification for the so-called stop and frisk process is the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *Id.* at 23, 88 S.Ct. at 1881. In *Peay*, we also concluded that a concern for the personal safety of an officer "need not be ignored when considering whether the 'totality of circumstances' permits an officer to 'detain that person briefly in order to "investigate the circumstances that provoke suspicion".'" *See Peay, supra,* 597 A.2d at 1322–23 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138,

---

4. The government in its Petition for Rehearing En Banc, while asserting that appellant lacks standing to contest the search of the vehicle in which he was riding, agrees (at p. 4) that appellant "may challenge seizures of his person and seek to suppress evidence which is the fruit of an unlawful seizure." Accordingly, we are not confronted by an issue of standing.

5. *See Thomas v. United States,* 553 A.2d 1206, 1207 n. 7 (D.C.1989) (police could properly order all the *occupants* out of a car lawfully stopped for a traffic violation). In the instant case, the police officer ordered the occupants of the car only to raise their hands in view rather than exit the car. *Id.* at 1212 (Newman, J., dissenting).

3150, 82 L.Ed.2d 317 (1984)).[6] Moreover, the Supreme Court has "specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms, supra,* 434 U.S. at 110, 98 S.Ct. at 333; *accord, Thomas v. United States, supra* note 5, 553 A.2d at 1207.

■ Thus, when we consider the totality of circumstances in the instant case, we are bound to take into account not only the time, the place and the circumstance, *viz.,* the auto occupied by appellant seeking to flee from Officer Braswell, but also the personal safety of Officer Zerega and that of the other officers as they confronted the auto in response to Braswell's call for assistance. In so doing, "the evidence of suspicion 'must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" *Peay, supra,* 597 A.2d at 1322 n. 9. "'[I]n judging the reasonableness of the actions of the arresting officer,' the circumstances 'are to be viewed through the eyes of *a reasonable and cautious police officer on the scene,* guided by his experience and training.'" *Id.* at 1322 (quoting *United States v. Young,* 194 U.S.App.D.C. 377, 379, 598 F.2d 296, 298 (1979)) (emphasis added); *see United States v. Mitchell,* 293 U.S.App. D.C. 24, 951 F.2d 1291 (1991).

### III.

■ In the instant case, the time was 3:30 a.m. and the place was an area of the city which one of the officers characterized as "a high drug area." [TR. 40] Police officers confronted a car which had just been in flight from a fellow officer and which contained two adult male occupants. The officers responding to the call for assistance were unaware of the nature of the crime in progress.[7] However, the trial

judge found, and the record supports such finding, that the officers reasonably perceived the circumstances as more than a mere traffic violation. In briefly freezing the situation while they ascertained the extent of the criminal activity in progress, the officers took reasonable steps to insure their safety. As Mr. Justice Harlan stated so aptly in his concurring opinion in *Terry, supra,* 392 U.S. at 33, 88 S.Ct. at 1886, "There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."[8]

The police intrusion upon appellant and the other passenger in this case was minimal. The officers did not touch the passengers, much less roust them from the car. The police never engaged in any verbal abuse or taunting. *Only after* appellant dropped his hands out of the officers' sight and moved his shoulder as if he were moving something did the police order him to alight from the car. We have characterized in the past a police command to a passenger to disembark from an auto lawfully stopped as a "very minor" intrusion. *Thomas v. United States, supra,* 553 A.2d at 1207 n. 7 (quoting *King v. United States,* 550 A.2d 348, 357 (D.C.1988)); *see United States v. Ordway,* 329 A.2d 776, 778 (D.C.1974). We are not persuaded that a police command to appellant, a passenger seated in an auto that has just stopped after first attempting to flee the police, is so intrusive as to constitute an unreasonable and unconstitutional seizure. The officers here complied with the mandate of *Terry* that justified their "freezing" the situation very briefly while an ongoing and fast moving criminal situation was clarified. As the Supreme Court noted in *United States v. Sharpe,* 470 U.S. 675, 686, 105

---

**6.** However, we did not say that "a concern based on personal safety, *standing alone,* will necessarily suffice to warrant a *Terry* stop." *Peay, supra,* 597 A.2d at 1322 (emphasis added).

**7.** Police officers "cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley,* 469 U.S. 221, 231, 105 S.Ct.

675, 682, 83 L.Ed.2d 604 (1985) (quoting *United States v. Robinson,* 536 F.2d 1298, 1299 (9th Cir.1976)).

**8.** It is clear that since the validity of the stop of the auto is not in dispute, the officers were lawfully beside the car after it ceased its flight and came to a stop.

S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), "the court should not indulge in unrealistic second-guessing" when an apparently still-developing situation exists. *See United States v. Hensley, supra* note 7, 469 U.S. at 228, 105 S.Ct. at 680.

Appellant contends that the fact that one of the "responding" officers (Massey) carried a shotgun rather than a pistol transformed the command to appellant and the other passenger into an unreasonable seizure because it constituted an excessive police intrusion. This officer was carrying a shotgun, he testified, [TR. 42], because "at that particular time of the year, within the past 30 days, seven policemen had been shot by various people in the District." No evidence was presented to suggest, much less show, that Massey's explanation for carrying a shotgun on the night in question was "the product of a volatile or inventive imagination, or was undertaken simply as an act of harassment." *Terry v. Ohio, supra,* 392 U.S. at 28, 88 S.Ct. at 1883.

Appellant also asserts that Massey was "brandishing" the weapon. The officer expressly denied [TR. 48] that he pointed his shotgun at appellant when he approached the auto. Zerega testified [TR. 178] that Massey had been holding the shotgun in his arms. Massey himself testified [TR. 147] that he had the shotgun pointed up, resting on his knee. Only when appellant dropped his hands below the dashboard out of the officers' view [TR. 50], and twisted his body in his seat did Massey point his shotgun at appellant. [TR. 42] We are not persuaded under these circumstances that the kind of weapon this officer happened to be carrying on the night in question and the particular use the officer made of his weapon so heightened the police intrusion as to render the seizure unreasonable and hence unconstitutional. *See United States v. White,* 208 U.S.App.D.C. 289, 295, 648 F.2d 29, 35, *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 70 L.Ed.2d 235

(1981). The officer's response seems upon this record to be entirely justified.

Finally, appellant asserts that since the auto had ceased its flight Officer Zerega overreacted when he directed the passengers to place their hands up in the air where they could be seen. Surely, it would have been both unreasonable and unprofessional for Zerega, under the circumstances, to "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). While the progress of the auto may have stopped at the time Zerega arrived, there was nothing to suggest or show to the responding officers the danger was over.[9]

## IV.

In sum, the trial court adjudged that what the officers did under the circumstances was reasonable. We agree with a comment made a quarter of a century ago by Judge Harold Leventhal of the United States Court of Appeals for the District of Columbia. He observed with his usual acuity: "As a society, we routinely expect police officers to risk their lives in apprehending dangerous people. We should not bicker if in bringing potentially dangerous situations under control they issue commands and take precautions which reasonable men are warranted in taking." *Bailey v. United States,* 128 U.S.App.D.C. 354, 364, 389 F.2d 305, 315 (1967) (concurring opinion).

*Affirmed.*

ROGERS, Chief Judge, with whom FERREN, Associate Judge, joins, dissenting:

Appellant, an automobile passenger about whom the police had no information to suggest that he was armed or dangerous or involved in any criminal activity, was confronted by a police officer holding a shotgun in the "ready" position and told to

---

9. Appellant strongly urged at oral argument that we adopt a rule that a police officer has no right to direct a passenger in a vehicle to place his hands in view unless such officer has *first* observed this passenger engage in suspicious con-duct. Such a restrictive rule would run contrary to the well-established principle that the propriety of police action in a fast-moving street encounter must be determined by its reasonableness under all the circumstances.

put his hands on the car ceiling. This occurred after the car had stopped for exceeding the speed limit by 15 miles an hour in a 30 miles per hour zone, and the first officer, whose gun had remained in its holster, had escorted the driver to his police car in order to issue the driver a traffic citation. Appellant had not been observed moving in any suspicious manner. Nor as the majority posits, did the second police officer simply insist that appellant keep his hands in view. *See* majority opinion at 97. If that were all that happened, this would be a different case, and an easy case. The trial judge, however, did not view the case as easy—ruling that appellant had been seized and observing that this was a "very close case"—and the record does not permit this court to do so either.

Undoubtedly, the police must be able to take reasonable precautions for their safety. But the Supreme Court has emphasized that the degree of police intrusion that can be constitutionally sustained under the Fourth Amendment depends on consideration of the public interest served, the nature and scope of intrusion, and objective facts upon which officer relied in light of his knowledge and experience the level of police intrusion. *See United States v. Mendenhall,* 446 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (citations omitted). Here, in the absence of articulable suspicion that appellant was armed or dangerous or engaged in criminal activity, appellant was ordered to assume the classic arrest posture by the second police officer who was holding a shotgun in the ready position after parking his car to block the car in which appellant was a passenger. *See id.* at 554, 100 S.Ct. at 1877 (seizure occurs when "a reasonable

person would have believed he [or she] was not free to leave"). Contrary to the majority's suggestion, *see* majority opinion at 101, this is hardly the same type of intrusion as occurs when an officer requests a passenger to get out of the car. *See Thomas v. United States,* 553 A.2d 1206, 1207 n. 7 (D.C.1989). Nor can it be equated with an officer requesting a passenger merely to keep his hands in view. *See In re T.T.C.,* 583 A.2d 986, 988 & n. 2 (D.C.1990) (prior decisions uphold *Terry* stop where officer's gun drawn involved police stop of persons about whom police had information that the suspect was armed).

The majority concludes, nevertheless, that appellant was not unlawfully seized, ignoring the dictates of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) (*Terry* requires "particularized and objective basis for suspecting the particular person stopped of criminal activity"). Instead the majority adopts a standard of reasonableness that is torn asunder from the history and purpose of the Fourth Amendment. *Cf. United States v. Rabinowitz,* 339 U.S. 56, 82, 70 S.Ct. 430, 442, 94 L.Ed. 653 (1950) (dissenting opinion of Mr. Justice Frankfurter, joined by Mr. Justice Jackson) ("By the Bill of Rights the founders of this country subordinated police action to legal restraints, not in order to convenience the guilty but to protect the innocent.... It may safely be asserted that crime is most effectively brought to book when the principles underlying the constitutional restraints upon police action are most scrupulously observed").[1]

Thus, the majority has given priority over all other considerations to an officer's

---

1. *See id.* at 83, 70 S.Ct. at 443:
   To say that the search must be reasonable is to require some criterion of reason. It is no guide at all either for a jury or for district judges or the police to say that an "unreasonable search" is forbidden—that the search must be reasonable. What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment: the history and the experience which it embodies and the safe-

guards afforded by it against the evils to which it was a response. * * * It is for this Court to lay down criteria that the district judges can apply. It is no criterion of reason to say that the district court must find it reasonable.
   Quoted (with the exception of the last two sentences) in the majority opinion in *Chimel v. California,* 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969).

perception of personal safety, as Judge Ferren points out in his separate opinion, in a context where the officer had "no discernible basis whatsoever ... for seizing any passenger of the car." [2] *Post* at 110. But, in *Terry, supra,* the Court specifically rejected "inarticulate hunches" and "simple good faith" of the officer as sufficient bases for "intrusion upon the constitutionally protected interests of the private citizen," observing that "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers and effects,' only in the discretion of the police" (quoting *Beck v. Ohio,* 379 U.S. 89, 97, 85 S.Ct. 223, 229, 13 L.Ed.2d 142 (1964)). 392 U.S. at 21–22, 88 S.Ct. at 1879–80; *see Duhart v. United States,* 589 A.2d 895, 897 (D.C.1991) ("The central inquiry in every *Terry* stop controversy is whether, given the totality of the circumstances at the time of the seizure, the police officer could reasonably believe that criminal activity was afoot") citing *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884. Under the en banc majority's new analysis, for certain citizens in certain parts of the District of Columbia, associational and locational taints will suffice; protection under the Fourth Amendment will be at the police officer's discretion. *But see Smith v. United States,* 558 A.2d 312 (D.C.1989) (en banc) (rejecting associational and locational taints as sufficient justification for a *Terry* stop).

Accordingly, for the reasons set forth in my opinion of September 20, 1991, before the division which Judge Newman [3] joined, reprinted below, and the dissenting opinion of Judge Ferren, *post,* I respectfully dissent.

Before the Division:

ROGERS, Chief Judge:

Appellant James Cousart appeals his convictions for carrying a pistol without a license, D.C.Code § 22–3204 (1989), possession of an unregistered firearm, *id.* § 6–2311, and unlawful possession of ammunition, *id.* § 6–2311, on the ground that the trial judge erred by denying his motion to suppress a gun found in the car in which he was a passenger. We hold that absent articulable suspicion regarding the passenger, the seizure was unlawful and accordingly, we reverse.

I

On January 3, 1988, at approximately 3:30 a.m., Officer Thomas Braswell of the Traffic Branch of the Metropolitan Police Department was on patrol in a marked police cruiser. At the intersection of First Street and Florida Avenue, Northeast, he observed a grey Pontiac driving southbound on First Street toward New York Avenue at a normal speed of thirty miles per hour.[1] As the car approached New York Avenue, the driver made a wide U-turn onto New York Avenue. Braswell followed the car westbound on New York Avenue. When the car's speed approached 45 miles per hour, Braswell "activated his emergency equipment," and pursued the car for two long blocks.[2] He also radioed for assistance, stating he was pursuing the car. The car pulled over immediately when Braswell was behind the car at First Street and New York Avenue, Northwest. Officer Braswell testified that his only purpose in stopping the car was to issue a traffic

---

**2.** In fact, according to the testimony of the second officer, it was the safety of the first officer that was his concern. The second officer testified that his purpose in responding to the scene was to "assist a fellow officer and to ensure his safety."

**3.** Judge Newman was a member of the division, but did not participate in the en banc proceedings.

**1.** Officer Braswell originally testified that the car was proceeding at a high rate of speed, but in response to a question by the trial judge stated that the car was going forty five miles an hour after making the U-turn, and the car had been driving normally, at thirty miles an hour, when the officer had first spotted the car.

**2.** Braswell explained that the car only went two blocks, but they were long blocks that he estimated to be the equivalent of three city blocks.

citation; he had no information to indicate that the people in the car were armed and dangerous or were engaging in criminal activity, and he only wanted to find out if the driver had a valid driver's license and registration and to issue a traffic citation. At no point did he pull his gun out of its holster.

Officer Joseph L. Massey, who monitored the radio broadcast that a Traffic Division cruiser was chasing an automobile for an unknown reason and then later that the auto had stopped, responded to "assist a fellow officer and to ensure his safety," being aware that the area was a high drug area. When he arrived at First Street and New York Avenue, the Pontiac had already pulled over. Massey parked his cruiser in front of the Pontiac. Two other police units also arrived on the scene. Massey saw Officer Braswell at the window of the Pontiac talking to the driver and then saw him order the driver out of the car and direct the driver to walk over to his scout car, which was behind the Pontiac.

As Officer Braswell questioned the driver near his scout car, Officer Massey walked over to the front of the Pontiac with his shotgun pointed up in the air. Like Braswell, Massey had no information that the people in the car were armed and dangerous or engaged in criminal activity; nor had he seen appellant (or anyone else in the car) do anything suspicious. Nevertheless, Massey ordered the two passengers to place their hands on the ceiling. Appellant dropped his hands below the dashboard, his right shoulder dropping down between the seat and the door, and then came back up empty handed. Massey pointed his shotgun at appellant and ordered him to put his hands up in the air. Appellant complied, and Massey requested Officer Zerega to remove appellant from the car. As Officer Zerega did so, he noticed a brown paper bag between the passenger seat and the door, and upon touching it, he felt a hard object, which proved to be a gun. Massey explained that he had his shotgun in his hands as he approached the Pontiac be-

cause "within the past 30 days seven policemen have been shot by various people in the District."

The trial judge ruled that appellant had standing to move to suppress the gun and that he was seized when Officer Massey initially ordered him to raise his hands to the ceiling. Noting that this was a "very close case," the judge concluded that in order to ensure their own safety, it was reasonable for the police to require appellant to raise his hands and keep them in sight. The trial judge noted that at the time the driver stopped the car, Officer Braswell knew that the car had attempted to flee the police in a high narcotics area. This information, although not communicated to the other officers, could, the trial judge ruled, be imputed to them. While Officers Massey and Zerega had no idea what had transpired, the judge concluded that it would be unreasonable to expect the officers to approach the car without doing "anything to protect themselves until they [could] find out what the situation is."

## II

The central inquiry under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is whether the police action in seizing appellant was reasonable. This requires "a comparison between the degree of police intrusion and the level of police justification." *In re T.T.C.*, 583 A.2d 986, 989 (D.C.1990) (citing *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980)). Police conduct will only be justified under the Fourth Amendment when "a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry, supra*, 392 U.S. at 30, 88 S.Ct. at 1884 (emphasis added). Nonetheless, at a minimum, the police officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

"[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry, supra*, 392 U.S. at 21, 88 S.Ct. at 1880.[3]

Appellant contends that he was unlawfully seized when Officer Massey approached the car with a drawn shotgun and ordered him to raise his hands to the ceiling because the officer lacked specific and articulable suspicion to believe that appellant was armed and dangerous or engaging in criminal activity.[4] He maintains that he exhibited no suspicious activity of his own, but was merely a passenger in a car whose driver had exceeded the speed limit by 15 miles per hour. The government does not contend that appellant was not seized, but rather responds that the seizure was justified because Officers Braswell and Massey reasonably believed that the driver and occupants posed a potential threat to their safety, and Massey's order that the passengers raise their hands and, after appellant's furtive gesture, exit the car was a reasonable precaution.[5] It relies on the circumstances that the police were pursuing a fleeing car in a high narcotics area at a time when, within the last months, seven police officers had been shot. Further, the government maintains that *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), should apply to passengers so that whenever an automobile has been detained for a traffic violation, the police may order the passenger to keep his hands in view. It relies on the circumstance that the evading car and "appellant's furtive movement within the car, clearly gave rise to the suspicion that approaching and detaining the vehicle and its occupants was not without risk."

## A

The difficulty with the government's reliance on a fleeing car as a basis for seizing a passenger arises, of course, from the fact that the passenger is not in control of the movement of the car. "[A]s a general proposition[,] ... flight from authority—implying consciousness of guilt—may be considered among other factors justifying a *Terry* seizure." *Smith v. United States*, 558 A.2d 312, 316 (D.C.1989) (en banc)

**3.** As summarized by the Court, its holding in *Terry* was that:

> where a police officer observes *unusual conduct* which leads him reasonably to conclude in light of his experience that *criminal activity* may be afoot *and* that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and *makes reasonable inquiries,* and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.,* 392 U.S. at 30, 88 S.Ct. at 1884–85 (emphasis added).

**4.** We agree with the trial judge that appellant has standing to challenge the seizure of the gun, although for a different rationale. The trial judge focused on the fact that circumstances indicated appellant was in possession of the gun. However, appellant is challenging the seizure of his person and any fruit thereof. Contrary to the government's contention, *Rakas v.*

*Illinois,* 439 U.S. 128, 150–51, 99 S.Ct. 421, 434, 58 L.Ed.2d 387 (1978) (Powell, J., concurring opinion), does not preclude a passenger in a car from objecting to his seizure and seeking to suppress evidence that is a fruit of the seizure. *See United States v. Manbeck,* 744 F.2d 360, 380–81 (4th Cir.1984) (ship passenger has standing to suppress evidence that may have been tainted by illegal arrest), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Durant,* 730 F.2d 1180, 1182 (8th Cir.) (car passenger has standing to challenge evidence attained as a direct result of an illegal stop), *cert. denied,* 469 U.S. 843, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984); 1W. LaFave and J. Israel, Criminal Procedure § 9.1(d) (1984) (occupant of another's car has standing to allege that evidence recovered from car was "tainted fruit" of an allegedly illegal seizure of the occupant).

**5.** In *California v. Hodari D.,* — U.S. —, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court clarified that a person is seized only as the result of the application of physical force or the actual submission to the officer's show of authority. *Id.,* — U.S. at —, 111 S.Ct. at 1550–51. It is undisputed that appellant was seized when Officer Massey, with his shotgun drawn, ordered appellant to place his hands on the ceiling.

(quoting *United States v. Johnson*, 496 A.2d 592, 597 (D.C.1985)). However, a desire to avoid the police, without more, cannot support an inference of consciousness of guilt. *In re D.J.*, 532 A.2d 138, 141 (D.C.1987). To provide a basis for reasonable suspicion, the facts surrounding the efforts to avoid the police must lead rationally to the conclusion that the individual's flight indicated consciousness of guilt.[6] *See Smith, supra*, 558 A.2d at 317 (and cases cited). In the context of an automobile passenger, the court has recognized that "one person's flight is imputable to another only if other circumstances indicate that the flight from authority implies another person's consciousness of guilt as well." *Johnson, supra*, 496 A.2d at 597.

Appellant's consciousness of guilt cannot be inferred from the fact that the driver did not stop the car immediately when Officer Braswell activated his emergency equipment. The driver was traveling at a normal speed before he made the U-turn and at only 45 miles per hour thereafter; there was no evidence regarding the point at which the driver realized that he was being pursued by the police. *See Smith, supra*, 558 A.2d at 316–17 ("in those cases in which we have found that flight indicated a consciousness of guilt, the accused clearly knew that the police were present and reacted by immediately running from the scene of the alleged crime"). Even though a passenger could be deemed to have been aware of a police siren and flashing lights, any inference of consciousness of guilt on the part of the passenger is considerably weakened where the driver voluntarily stops the car.

Even if the driver's flight implied a consciousness of his own guilt, the evidence, as the trial judge recognized, did not support imputation of the flight to appellant.[7]

There was no evidence of a joint venture such that the driver's flight "reflected the mind set and activity of those with whom he was associated under somewhat suspicious circumstances." *Johnson, supra*, 496 A.2d at 597 (citations omitted). There also was no evidence that appellant gave any instructions to the driver to flee the police, nor anything to suggest that appellant was more than an unwitting participant in the driver's flight. Nor did the officers note anything unusual about the car or the number of persons in the car. The circumstances known to the officers—the driver's flight in a high crime area at a time when seven police officers had been shot in the last months—cannot, therefore, justify appellant's seizure, particularly when the officer most knowledgeable of the circumstance stated that he intended only to issue a traffic citation to the driver and never drew his gun.

Appellant's seizure also cannot be justified because the flight occurred in a high narcotics area. The high narcotics area " 'familiar talismanic litany, without a great deal more, cannot support an inference that appellant was engaged in criminal conduct.' " *Smith, supra*, 558 A.2d at 316 (quoting *In re D.J., supra*, 532 A.2d at 143). "[A] great deal more," *id.*, is missing here. Appellant's movement, on which the government relies, did not occur until after Officer Massey, with his shotgun in hand, had ordered the passengers to raise their hands to the ceiling of the car. Moreover, the circumstances and location of the seven police shootings were never identified, not even as involving traffic stops.

## B

The government's further contention in justification of appellant's seizure rests on

---

6. Officer Braswell's knowledge regarding the driver's conduct is properly imputed to the other police officers. *See Whiteley v. Warden*, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971).

7. The trial judge stated:
   Admittedly here, there is no indication that the passenger in the vehicle turned around to look, or did anything prior to the vehicle stopping or after the vehicle was stopped, before the police gave them an instruction that would suggest that the passengers were in any way associated with any type of illegal activity that could be imputed to them, based upon the acts of the driver.

*Pennsylvania v. Mimms,* in which a police officer stopped the driver of the car for driving an automobile with an expired license plate. *Mimms, supra,* 434 U.S. at 107, 98 S.Ct. at 331. The officer approached the driver to write a ticket and asked him to get out of the car. *Id.* As the driver alighted, the officer noticed a large bulge under his jacket. *Id.* Fearing that the bulge was a weapon, the officer frisked the driver, found a gun, and arrested him. The Court upheld the seizure, holding "that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.* at 111 n. 6, 98 S.Ct. at 333 n. 6. They may do so even though "the officer[s] had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior." *Id.* at 109, 98 S.Ct. at 333. The Court balanced, on the one hand, the interest in diminishing "the possibility, otherwise substantial, that the driver can make unobserved movements" and, on the other hand, the minimal intrusion on the driver's liberty interest since the driver is already detained once the police pull him over for a traffic violation and it makes little difference that he is detained in his seat or outside the car. *Id.* at 110, 98 S.Ct. at 333.

The rationale articulated in *Mimms* with respect to the driver of a car is not readily extended to a passenger in appellant's circumstances.[8] The intrusion on the passenger's privacy interest is clearly greater than on the driver. A driver who is lawfully detained for a traffic violation can reasonably expect to be ordered out of the car or temporarily detained in connection with the traffic infraction. By contrast the passenger is an innocent bystander who has no reason to expect that the stop of the car will result in his seizure. In addition, the officer's safety can be assured by insisting that the passengers keep their hands in sight, while the police inquire about events, and by having the law-violating driver accompany the police to a police vehicle.[9]

Finally, the risk of accidental injury from passing traffic, of concern to the Court in *Mimms,* is less likely when the officer is on the passenger side of the car.

Because of these concerns, a number of courts have declined to extend *Mimms* to all passengers:

[B]y stopping the automobile the police have decided that the driver will be detained. Such is not the case for the passenger, who has broken no law and who may walk away from the scene unless the police officer has some other legitimate reason to detain him. Certainly the passenger has a higher expectation of privacy than the driver, because the passenger plays no part in the routine traffic infraction and has reason to suppose that any exchange with the authorities will be conducted by the driver alone.

---

8. *United States v. White,* 208 U.S.App.D.C. 289, 648 F.2d 29, *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 70 L.Ed.2d 235 (1981), is not to the contrary. In *White,* the United States Court of Appeals for the District of Columbia Circuit stated that there was individualized suspicion with respect to all of the occupants of the car:

Based on the particular facts of this case, we conclude that an anonymous tip about an ongoing [drug distribution] transaction, detailed as to time and place, including a specific description of one of the participants and their vehicles as well as their modus operandi, and verified by the officers through surveillance in all details except for the actual possession or exchange of narcotics provides a

sufficient basis for a legitimate *Terry* stop to question the occupants as to their identity and visually check inside the car. Where necessary, this approach to the car may be enforced—as it was here—by an order to the occupants to get out of the car.

208 U.S.App.D.C. at 303, 648 F.2d at 43.

9. *See* LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(a) (2d ed. 1987) at 515 ("the potential danger to police engaged in traffic enforcement could be adequately met if the police allowed passengers to remain in the stopped vehicle and instead had the driver accompany them to the police vehicle while the citation is prepared") (footnote omitted).

*State v. Williams,* 366 So.2d 1369, 1374 (La.1978); *see People v. Maxwell,* 206 Cal. App.3d 1004, 254 Cal.Rptr. 124 (1988); *State v. Becker,* 458 N.W.2d 604 (Iowa 1990); *Johnson v. State,* 601 S.W.2d 326 (Tenn.Ct.App.1980); *State v. Schlosser,* 774 P.2d 1132 (Utah 1989). *See generally* 3 W. LaFave, *supra,* (disapproving the extension of *Mimms* to passengers).[10] These courts have, in sum, declined to recognize an exception to *Terry's* requirement of particularized suspicion for a passenger in a car stopped for a traffic violation.

Even were the rationale underlying the balance of interests by the Court in *Mimms* applied to a passenger seized after the vehicle is stopped for a traffic violation, the government's reliance on *Mimms* is misplaced. In *Jones v. United States,* 391 A.2d 1188, 1190–91 (D.C.1978), the court rejected the government's argument that the police officer could order the occupants out of a car for his own protection once he had reason to speak to them. *"Mimms* does not ... hold that a police officer may similarly intrude upon a person's right to personal security in a situation where he is not detaining him for a violation of law, but merely desires to make inquiry of circumstances which are only marginally suspicious." *Id.*[11] Here, after the car had stopped of its own accord, Officer Braswell, the first officer to approach the car, spoke with the driver and took him to a scout car twenty-five feet away. At no time did Braswell remove his gun from his holster; neither did any other officer. By the time Officer Massey approached the passengers, there was nothing to indicate that Braswell did not already have the situation under control. Contrary to the observation of the trial judge, that the officer could reasonably insist that the passengers keep their hands in sight, a proposition with which we do not disagree, Massey's first reaction was to take his shotgun and order the passengers to grab the ceiling. Yet, Massey, like Braswell, had no information that appellant or any one else in the car was engaged in criminal activity and did not recall anyone suggesting that appellant had done anything suspicious with his hands before he was ordered to grab the ceiling. By contrast, our decisions upholding *Terry* stops where the police have drawn their guns have involved suspects whom the police had reason to believe were armed. *T.T.C., supra,* 583 A.2d at 988 & n. 2 (citations omitted).[12]

While Officer Massey could reasonably conclude that high drug areas present potential danger for the police, neither the Supreme Court nor this court have sanctioned the seizure of citizens in the absence of articulable suspicion required by *Terry,*

10. *Contra, State v. Williams,* 371 So.2d 1074 (Fla.Dist.Ct.App.1979), *cert. denied,* 381 So.2d 771 (Fla.1980); *State v. Ferrise,* 269 N.W.2d 888 (Minn.1978).

11. In *Jones,* the court reversed the conviction for possession of marijuana on the ground that when the police ordered the driver and passenger out of the car, the police did not have individualized, particularized, suspicion. The court discussed *Mimms,* but noted that *Mimms* did not control because the police had not detained the driver after observing a traffic violation, but only after observing "marginally suspicious" circumstances. *Id.* at 1191. Two men had been seated in a parked car late at night in an area known for illegal drug trafficking and robberies; as the police officer moved closer to the car, one man had attempted to hide something under the seat.

12. On several occasions this court has addressed situations where a car passenger challenges his seizure. The court upheld such seizures on the ground that the police had particularized suspicion with respect to the passenger. *See, e.g., Byrd v. United States,* 579 A.2d 725, 729 n. 9 (D.C.1990) (passenger dropped or laid an object on floor of car and threw an object into rear seat after arrest of driver for failing to produce driver's license); *Thomas v. United States,* 553 A.2d 1206, 1207 n. 7 (D.C.1989) (ordering occupants out of car after car stopped for two traffic violations, running a stop sign, and exceeding the speed limit, enabling police to see bag with ski masks in summertime). And the court has held that after a car is driven to the police station, the police can order the passengers out of a car in order to ensure that items in the car are not removed. *United States v. Ordway,* 329 A.2d 776, 778 (D.C.1974); *cf. King v. United States,* 550 A.2d 348, 357 (D.C.1988) (probable cause for arrest; suspected drug distributors, upon identification by arresting officer based on broadcast description, were ordered out of the car in order to allow police to obtain a better view, "a very minor intrusion indeed").

*supra,* 392 U.S. at 1, 88 S.Ct. at 1868; *e.g., Smith, supra,* 558 A.2d at 312; *Jones, supra,* 391 A.2d at 1191 ("[t]o hold otherwise would allow the government to bootstrap its way to a full blown 'seizure' in the absence of articulable facts indicating that 'criminal activity is afoot' " (quoting *Terry, supra,* 392 U.S. at 30, 88 S.Ct. at 1884)). The intrusion on appellant's liberty interests was more intrusive than that which occurred in *Mimms,* where the driver, after being lawfully detained, was ordered out of the car for a brief period; "the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." 434 U.S. at 111, 98 S.Ct. at 333.[13] As the trial judge acknowledged, appellant was not seized "based upon his own conduct, . . . [but because he] only happen[ed] to be with somebody who ha[d]" committed a traffic violation. Such a departure from *Terry* 's requirement of particularized individualized suspicion would not be warranted by the doctrine of *Mimms. See United States v. Di Re,* 332 U.S. 581, 593, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948) ("[p]resumptions of guilt are not

lightly to be indulged from mere meetings"); *Smith, supra,* 558 A.2d at 314 (eschewing the notion of "guilt by association").[14] Were a stop of a driver for a routine traffic violation sufficient ground for seizing all of the passengers, the constitutional protections of the passengers under the Fourth Amendment would be ephemeral and concern about police security, as a result of unidentified events at other times and in other places, would be elevated above all other important societal interests.[15]

Accordingly, we hold that the trial judge erred in denying appellant's motion to suppress the gun, and the judgments of conviction are reversed.

*Reversed.*

FERREN, Associate Judge, with whom ROGERS, Chief Judge, joins, dissenting:

I join in Chief Judge ROGERS' dissent. This is simply a case in which a police officer, responding to a radio run, observed that a fellow officer—whose gun was not drawn—was questioning the driver of a parked car. The driver was already stand-

---

13. *Davis v. United States,* 498 A.2d 242, 245 (D.C.1985), and *White, supra,* 208 U.S.App.D.C. at 294 n. 27, 648 F.2d at 34 n. 27, do not help the government. These cases do not hold that an approach of an officer with his gun drawn, but not pointed at the suspect, is a minimal intrusion. *Ordway, supra* note [13], 329 A.2d at 778, also provides no assistance to the government since in that case the passengers were ordered out of the car in connection with police efforts to take temporary custody of the car after the driver had been stopped for a traffic violation. The *Ordway* court stated that "the intrusion was different and even less severe than in the so-called 'stop' cases." *Id.* Nor is the intrusion here comparable to that in *King, supra* note [13], 550 A.2d at 357, where the defendants were identified as suspected drug distributors and then asked to get out of the car.

14. The trial judge's alternative rationale for departing from the individualized suspicion requirement of *Terry* bodes no better. In discussing the actions of Officers Massey and Zerega, the trial judge suggested that since they did not know why Officer Braswell had stopped the Pontiac they were entitled to seize appellant:

And in light of the fact that they didn't know about what had taken place, all they knew based upon the radio run they received, was

that a fellow officer was in pursuit of an individual in a vehicle that, according to the officer, was fleeing from the officer, and then these officers get on the scene, they don't have any idea what has transpired, what the circumstances were, to under the circumstances, it would seem to me, [to be unreasonable to] require the officers to basically get out and approach the car, not knowing what has transpired and not do anything to protect themselves until they find out what the situation is.

This might be fine if the officers had done only that. Instead, Officer Massey, before finding out anything, seized appellant.

15. Contrary to the suggestion by the dissent, the majority does not suggest that the police may not take reasonable precautions to protect themselves. The circumstances here, which the dissent downplays, involved the confrontation of a passenger in a stopped car by a police officer holding a shotgun and ordering him to raise his hands to the ceiling after the traffic-violating driver had been removed from the car by another officer who saw no reason to take out his own gun at any time, even when he spoke to the driver while the passenger was in the car. What happened here involves more than the police simply insisting that car passengers keep their hands in sight.

ing outside the car with the first officer. The second officer had no discernible basis whatsoever—and certainly nothing said over the radio run provided a reason—for seizing any passenger of the car. As a precaution, the second officer, without effecting a seizure, could have requested the passengers to keep their hands in sight. Instead, holding a shotgun, he ordered them to raise their hands in a manner typical of an arrest. This was a seizure—no one disputes that—without a reasonable, articulable suspicion of criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). The fruit of that unlawful seizure, the pistol, should have been suppressed.

The majority simply asserts, without the benefit of any evidence or finding, that the approaching officer could not have assured that the passengers kept their hands in sight short of a "hands up" command tantamount to a seizure. *See* at 97 n. 1. An appellate court does not have authority to make such a finding *ex cathedra.*

As I have feared, *see Peay v. United States,* 597 A.2d 1318, 1325–26 (D.C.1991) (en banc) (Ferren, J., joined by Rogers, C.J., and Schwelb, J., dissenting), this court is now justifying a *Terry* seizure solely on the basis of a police officer's concern for personal safety, without regard to any other, objective circumstance warranting a seizure. "A *Terry* seizure, rather, must be reasonably premised on the suspect's behavior, not on a police officer's subjective state of mind." *Id.* at 1325.

"The central inquiry in every *Terry* stop controversy is whether, given the totality of the circumstances *at the time of the seizure,* the police officer could reasonably believe that criminal activity was afoot." *Duhart v. United States,* 589 A.2d 895, 897 (D.C.1991) (emphasis added). The police officer here, with shotgun at the ready, seized appellant before the officer had any "particularized and objective basis for suspecting the particular person stopped of

criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *see also Terry,* 392 U.S. at 21, 88 S.Ct. at 1879.[1] At the moment the officer gave the "hands up" command—a show of authority restraining liberty, *see Duhart,* 589 A.2d at 897—that seizure was not warranted by the totality of the circumstances. It violated the Fourth Amendment. *See, e.g., id.* at 901.

Respectfully, therefore, I dissent.

---

1. The "demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*" *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695 (quoting *Terry,* 392 U.S. at 21 n. 18, 88 S.Ct. at 1880 n. 18) (emphasis in *Cortez* ).