Garfield A. POWELL, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CM–1402.

District of Columbia Court of Appeals.

Argued Nov. 22, 1993 *.
Decided Nov. 10, 1994.

Thomas Engle, Washington, DC, for appellant.

Larry Gusman, Asst. U.S. Atty., Washington, DC, with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Robert J. Spagnoletti, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before FARRELL, KING and SULLIVAN, Associate Judges.

PER CURIAM:

The judgment of the trial court is reversed for the reasons stated in the lead opinion of

* The case was originally submitted on the summary calendar, however, the court subsequently scheduled oral argument on the above date. After oral argument, the court concluded that additional factual findings were necessary and the record was therefore remanded, on November 30, 1993, with instructions to the trial court to make certain specific additional findings. The supplemental record, with additional findings was filed March 4, 1994. The court then invited supplemental memoranda in light of the findings on remand. Appellant initially advised the court that he did not wish to submit anything further. The government then filed a memorandum on May 26, 1994. Appellant then filed a response to the government's memorandum on June 7, 1994.

Judge Sullivan and the concurring opinion of Judge Farrell. Judge King dissents from the opinion of the court for the reasons set forth in his dissenting opinion. Accordingly, this case is remanded to the trial court for further proceedings consistent with this opinion.

*Reversed and remanded.*

SULLIVAN, Associate Judge:

I write separately to express my own reasons for concluding that the trial court erred by denying appellant's motion to suppress evidence.[1]

### I.

### Introduction

Simply, this case is about a District of Columbia citizen who, while operating an automobile, had the misfortune of being stopped by three police officers at three o'clock in the morning. The citizen did nothing more than to question the police officers about the reason for the stop. After turning over his driver's license and motor vehicle registration, the citizen was asked to step from his car, which, as appellant concedes, was legitimate. *See Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). Thereafter, he was frisked by Officer Hernandez, which, in my view, was not warranted under the circumstances because Hernandez lacked sufficient grounds to form a *reasonable belief* that appellant was armed and dangerous. Although a pistol was recovered from the citizen, this court has previously held that the end result can *never* justify the constitutionality of the circumstances leading to a seizure of evidence. *Brown v. United States,* 590 A.2d 1008, 1013 (D.C.1991) (citation omitted).

Twenty-two years ago, Circuit Judge J. Skelly Wright wrote in a dissenting opinion:

This is a disarmingly simple case, but the court's disposition of it, in my judgment jeopardizes the privacy and the constitutional rights of every citizen who drives a car in the nation's capital.

*United States v. Green,* 151 U.S.App.D.C. 35, 40, 465 F.2d 620, 625 (1972) (Wright, J., dissenting). Judge Wright's statement is as timely today as it was in *Green* and it accurately reflects my concern with the trial court's disposition of the suppression motion in this "disarmingly simple case." On the record here, I cannot conclude that no constitutional violation occurred when appellant was frisked. Accordingly, the trial court's judgment is reversed.

### II.

### The Motion Hearing

Officer Hernandez, an *eleven-month* veteran of the Metropolitan Police Department, at the time of appellant's arrest, was the only officer who testified at the motion hearing. Essentially, Officer Hernandez testified that he and two other officers, while on routine patrol at three o'clock in the morning observed appellant make an abrupt left-hand turn into an alley. The officers followed appellant, and when appellant failed to observe a stop sign, the officers signaled for him to pull over. Officer Hernandez testified that prior to appellant stopping his vehicle, he observed appellant *bend* or *duck* towards the passenger seat. After appellant stopped his vehicle, Officer Papricka requested appellant's driver's license and registration. After a brief hesitation, appellant furnished the officers with the requested documents. Appellant was then ordered out of the car, and upon exiting the car, Officer Hernandez took appellant to the rear of the car where the officer conducted a frisk of the appellant and recovered a pistol.

Appellant's testimony was that he usually proceeded through the alley because the alley was a "well-known short-cut" to avoid traffic lights. Appellant was not discredited on this point. Further, appellant testified that he did not know the officers were behind him either in the alley, or when he exited out of the alley onto the street. Upon noticing the emergency lights activated on the police patrol car, appellant testified that he hesitated before stopping because he wanted to make sure that it was him they were pulling over. The appellant testified, and this testi-

---

1. I have no substantial disagreement with the     opinion of my concurring colleague.

mony was credited by the trial court, that once the officers approached his vehicle, *pursuant to Officer Papricka's request,* appellant *reached* for his motor vehicle registration from the glove compartment of his vehicle. Appellant testified that after he provided Officer Papricka with the requested documents, he was instructed to step from his vehicle, at which time Officer Hernandez took appellant to the rear of his car and conducted the frisk.

reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 29, 88 S.Ct. at 1883. (citations omitted) (emphasis added). The officer must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the officer's belief that he is in danger." *Id.* at 21, 88 S.Ct. at 1880.

## III.

### The Standard of Review

■ Our scope of review for an order denying a motion to suppress evidence is set forth in D.C.Code § 17–305(a) (1989).[2] "We are bound by the trial court's factual findings unless clearly erroneous or not supported by the evidence." *Holston v. United States,* 633 A.2d 378, 386 n. 10 (D.C.1993) (citations omitted). Moreover, in reviewing the trial court's denial or grant of a motion to suppress, this court's review is *de novo. Lewis v. United States,* 632 A.2d 383, 385 (D.C.1993) (citations omitted). "Essentially, our role is to ensure that the trial court had a substantial basis for concluding that no constitutional violation occurred." *See Brown, supra,* 590 A.2d at 1020. In this case, the trial court's findings are clearly erroneous and not supported by the evidence.

■ In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that a police officer is authorized to conduct a "reasonable search for weapons for the protection of the officer *where he has reason to believe that he is dealing with an armed and dangerous individual* ... the officer need not be absolutely certain that the individual is armed; the issue is whether a

## IV.

### Discussion and Analysis

The trial court found that the unusual route of the motorist, the passage of time before appellant stopped his vehicle, appellant's reaching movements toward the passenger side of the vehicle, the "hesitancy and nervousness" on his part, and the lateness of the hour, contributed to Hernandez's[3] belief that the appellant was armed and dangerous. I will address the shortcomings of those factors.

#### A. The Unusual Route

The record does not support the trial court's finding that the "unusual route"[4] appellant had taken contributed to Hernandez's belief that appellant was armed and dangerous. Appellant offered uncontroverted testimony that he turned into the alley "to avoid the lights at 3rd and Missouri." Turning into the alley, according to appellant, was a "common practice," and a "well-known shortcut." Officer Hernandez, an *eleven-month* veteran of the Metropolitan Police Department at the time of appellant's arrest, and the *only* one of three police officers involved in this incident to testify at the motion hearing, did not offer *any* testimony which char-

2. "[W]hen the case was tried without a jury, the court may review both as to facts and law, but the judgment may not be set aside except for errors of law, unless it appears that the judgment is plainly wrong or *without evidence to support it.*" D.C.Code § 17–305(a) (1989) (emphasis added). The scope of review pursuant to § 17–305(a) has been interpreted to be identical to the "clearly erroneous" standard under Super.Ct.Civ.R. 52(a). *See Vereen v. Clayborne,* 623 A.2d 1190, 1192 (D.C.1993) (citations omitted).

3. Although three officers were present when appellant was pulled over, only one police officer testified at the suppression hearing. Thus, my opinion refers only to that police officer and his beliefs.

4. "One, is the unusual route that the driver had just taken, although it may be that the purpose of that route was to avoid lights ... that does not mean that the officers were unreasonable in seeing this as an unusual route to be taking at three in the morning." Findings of Fact.

acterizes appellant's turn into the alley as unusual.

■ In ruling on appellant's suppression motion, the trial court had an obligation to weigh the testimony of *both* witnesses concerning the route through the alley, and make an appropriate finding consistent with the evidence. Since the only evidence in the record concerning whether the route was usual *vel non*, comes from appellant, who was not discredited on this point, and his testimony was that the route was *his* usual route, the trial court's finding that the route was "unusual" is clearly erroneous as it has not one shred of support in the record. Although we are required to draw all facts and inferences in favor of sustaining the trial court's ruling, *see Peay v. United States,* 597 A.2d 1318, 1320 (D.C.1991) (en banc), our deference is not *carte blanche* and certainly not warranted where the record is devoid of any evidentiary basis for such a finding.

### B. *The Passage of Time Before Appellant Stopped His Vehicle*

The government and my dissenting colleague attempt to create a dramatic situation of a high-speed chase based upon the trial court's statement that "[s]ome time passed before the [Appellant] stopped...." Quite simply, while such a scenario makes great drama, and in other circumstances, may assist in establishing reasonable suspicion,[5] no chase or flight occurred in this case, as recognized by the trial court in its finding that "there wasn't actually any kind of flight, or chase, involved...." In making this finding, the trial court credited appellant's testimony that "[h]e was really making sure that it was [him] that they [police] were pulling over."

Moreover, Officer Hernandez testified that "it didn't seem that he was trying to get away ...," which was consistent with Hernandez's testimony that appellant was *not* ticketed for failure to respond to the emergency signals. Further, Hernandez testified that he had completed the PD–163 which stated that appellant took only approximately three quarters of a block to come to a stop. These are hardly the ingredients that comprise a flight or a chase scene—by any stretch of the imagination. Again, the trial court's finding that "the passage of time" somehow contributed to a reasonable belief that appellant was armed, warranting appellant's frisk, is not supported by the record.

### C. *Appellant's Reaching Movements*

The trial court ruled that "[t]here were reaching movements that everyone agrees to. And, certainly, the act of reaching back into one's pocket may very well look like—may involve some leaning, or whatever, that is not totally inconsistent with a reaching toward the passenger side of the car." First, there were only two witnesses at the suppression hearing, appellant and Officer Hernandez. *Neither* of these people testified about appellant reaching back into any pocket or towards the passenger side of the car. Second, although Officer Hernandez testified that he observed appellant *bend* or *duck* down towards his passenger seat, this testimony was likewise not addressed by the trial court.

The only testimony regarding any reaching by appellant was provided by appellant when he testified that, pursuant to Officer Papricka's request, he reached into his glove compartment for his license and registration and

---

**5.** *Cousart v. United States,* 618 A.2d 96, 99 (D.C. 1992) (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 1878, 123 L.Ed.2d 496 (1993), discussed the significance of the flight factor. In *Cousart,* two on-duty officers, Massey and Zerega, received a call from a fellow officer, Braswell, at 3:30 a.m., to assist in the apprehension of a car which the latter was in the process of chasing. Braswell had observed the car make a reckless turn onto a street. *Id.* at 98. Braswell activated his emergency equipment, but the car refused to stop. *Id.* After Braswell determined the car was not going to stop, he called for assistance from Massey and Zerega. *Id.* Six blocks later, the car stopped. *Id.*

The trial court found, and this court affirmed, that

> there is even a little bit more than just a traffic violation, because he [Officer Braswell] said, and I think reasonably ... that the driver was attempt to avoid and flee from the presence of the officer, which adds more a little more to the case as compared with the officer just having seen a traffic violation.

*Id.* at 99; *see also McGee v. United States,* 270 A.2d 348, 349 (D.C.1970) (court found reasonable suspicion when police officer had to cut the defendant's car off to get him to stop).

handed both documents to Officer Papricka. On this point, the trial court stated in its Supplemental Findings of Fact, "[t]he Court finds that Officer Hernandez [the only officer to testify at the suppression hearing] simply did not remember the details of whether [appellant] had searched his glove compartment or not, or had handed over any papers or not," to Officer Papricka. Moreover, the trial court expressly credited appellant's testimony that he did produce and give his driver's license and registration to Officer Papricka.

Although the present case is not a "furtive movement" case, the government and Judge King rely on *In re D.E.W.*, 612 A.2d 194, 198 (D.C.1992), a "furtive movement" case, as authority. The decision in *D.E.W.*, however, reveals that the holding of that case requires a contrary result in this case. In *D.E.W.*, two juveniles were stopped by a police officer for failing to observe several stop signs. *Id.* at 195. As the officers approached the car, Officer Cullen observed D.E.W. trying to "[s]hove something down the front part of his pants under his coat." *Id.* D.E.W. stopped moving and "held his hands over the area where he was pushing." *Id.* Observing D.E.W.'s actions, the officer believed D.E.W. was concealing a gun. *Id.* Hence, the officer drew his gun and ordered D.E.W. out of the car. *Id.* The officer frisked D.E.W. and recovered a pistol from his pants. *Id.*

This court, in affirming the trial court's judgment, stressed that the movement of D.E.W. "was more than a furtive gesture," and "appeared to be an *unambiguous* effort to conceal a weapon." *Id.* (emphasis added). Consequently, we held that the officer had a reasonable suspicion that D.E.W. was armed and dangerous, and a frisk of D.E.W. for the weapons was constitutional. *See also United States v. Mitchell*, 293 U.S.App.D.C. 24, 951 F.2d 1291 (1991) (officer's observation of passenger through the window moving both his hands inside his coat as he leaned forward supported reasonable suspicion for a frisk).

In contrast to *D.E.W.* and *Mitchell*, this court in *United States v. Page*, 298 A.2d 233 (D.C.1972), affirmed the trial court's ruling that the passenger's furtive movement did not provide a reasonable suspicion to justify a frisk. In *Page*, two officers, sitting on their scooters at 5:00 p.m., observed a car going east at a high rate of speed. *Id.* at 234. The officers followed the car and overtook it as the car stopped for a traffic light. *Id.* At that time, Page, seated in the right rear seat, "looked around at the officers and then moved his right arm and shoulder as if to hide something, or put something away, get something." [6] *Id.* Upon being questioned by the officer about his movement, Page answered that he was hiding a beer can. *Id.* Fearing for his and his partner's safety, the officer ordered Page from the car. *Id.* Once outside the car, the officer did a quick pat-down and recovered a pistol and some white powder wrapped in tin foil from Page's person. *Id.*

This court concluded that no reasonable suspicion existed to search the passenger after this routine traffic stop. We stated that "[f]urtive movements standing alone hardly warrant a search...." *Id.* at 237 (citations omitted). Finally, the court stated that "[a] vague suspicion based largely on ambiguous conduct ... where the only reason for the stop and investigation is a simple traffic offense without any indication of criminal activity either on the part of the driver or passengers ... [i]n our view do[es] not establish a reasonable basis for a frisk." *Id.* at 237.

The cases of *D.E.W.*, *Mitchell*, and *Page* show that the ambiguous character of the movement plays a crucial role in the determination of whether reasonable suspicion exists. In the present case, however, appellant's unambiguous reaching movement into his glove compartment, *pursuant to a directive from a police officer*, to retrieve his license and registration is insufficient, even in combination with the other factors, to justify his frisk.

---

**6.** The officer testified that on the scene "[i]t was obvious he was trying to hide something." During the suppression hearing, however, the officer testified that "it was possible that appellee could have been reaching for a handkerchief or putting a pack of matches in his pocket." *Page, supra,* 298 A.2d at 234.

D. *Hesitancy and Nervousness*

Next, the trial court found that appellant's hesitancy and nervousness supported the officers' concern for their safety. The trial court included within its calculation of the officers' reasonable suspicion, appellant's "hesitancy and nervousness" which was displayed only *after* the decision to frisk him had been made. A fundamental requirement under the Fourth Amendment is that the facts upon which a frisk is based must be in the officer's possession before the frisk. *See Brown, supra,* 590 A.2d at 1013 ("A search is not made legal by what it turns up; it is good or bad when it starts and does not change character from its success . . .") (quoting *United States v. Di Re,* 332 U.S. 581, 595, 68 S.Ct. 222, 228, 92 L.Ed. 210 (1948)).

In this regard, appellant was ordered to get out of the car by Officer Papricka, who had approached appellant's vehicle from the driver's side. At that point, as found by the trial court, appellant had already given his driver's license and registration to Papricka. Once out of the car, Officer Hernandez ordered appellant to place his hands on the car. At this crucial point when Hernandez ordered appellant to assume the search position, Hernandez had already made the decision to frisk appellant. Hence, appellant's "admitted hesitancy and nervousness" which, according to Hernandez's unambiguous testimony, occurred *after* the frisk decision had been made, can not be—and should not have been—included in the trial court's determination of reasonable suspicion.[7] The inclusion of this after-the-fact information was clearly erroneous.

After removing from the deliberative process appellant's hesitancy and nervousness which was observed *after* the decision to frisk was made, all that remains is appellant's initial hesitancy in providing the officers with the requested documents. In this regard, the trial court acknowledged appropriately in its decision that "this hesitancy and nervousness may not be unusual when people are stopped." *See, e.g., Rogers v. State,* 206 Ga. App. 654, 426 S.E.2d 209, 213 (1992) (driver's nervousness and repetition when answering police officer's questions did not provide reasonable suspicion that defendant was engaged in criminal activity and did not justify search of his person); *People v. Kramer,* 208 Ill.App.3d 818, 152 Ill.Dec. 879, 881, 566 N.E.2d 756, 758 (3 Dist.1991) (pat-down search of occupants of vehicle stopped for parking in no-parking zone, after officer checked identifications which were found satisfactory, was not justified, where officers observed no suspicious behavior on part of occupants, other than nervousness, that might indicate they were armed and dangerous). Thus, the best possible scenario is that appellant hesitated in giving Officer Papricka the requested documents, but only after asking the officer "why he was getting pulled over." Under these circumstances, I fail to see how a request by a citizen of the District of Columbia to a uniformed police officer, and his two fellow officers, inquiring about the reason for being stopped, can be termed uncooperative and provide a basis for frisking that citizen, especially when the driver's license and registration had already been produced by appellant. To me, such a request of the officer seems well within the bounds of reason.

E. *The Lateness of the Hour*

Appellant was stopped by the police at three o'clock in the morning. The lateness of the hour, however, should not, under the circumstances of this case, suggest criminal conduct or form the basis for a belief in suspicious behavior. The fact that police officers encountered an individual in the early morning hours does not provide a basis for a seizure. *See, e.g., Adams v. Williams,* 407 U.S. 143, 153, 92 S.Ct. 1921, 1926, 32 L.Ed.2d 612 (1972) (Marshall, J., dissenting); *Jones v. United States,* 391 A.2d 1188, 1191 (D.C. 1978); *Crowder v. United States,* 379 A.2d 1183 (D.C.1977); *Stephenson v. United States,* 296 A.2d 606 (D.C.1972), *cert. denied,*

---

7.  Q  What happened when [appellant] got out of the vehicle?
   A  I asked [appellant] to place his hands on the car, and he didn't want to do that.

   Q  When you say, he didn't want to do that, it's fair to say, he was surprised and said, why, what am I charged with?
   A  No, he wasn't surprised, he was nervous. Officer Hernandez and Defense Counsel.

411 U.S. 907, 93 S.Ct. 1535, 36 L.Ed.2d 197 (1973). As Judge Wright recognized in his dissenting opinion in *Green*, "it seems clear otherwise innocent conduct cannot be transformed into culpable behavior simply by virtue of the lateness of the hour. It is no crime for a citizen to be out after dark." *Green*, *supra*, 151 U.S.App.D.C. at 41 n. 3, 465 F.2d at 626 n. 3.

In sum, the record in this case simply fails to amply support the trial court's decision that the officers had a reasonable suspicion that appellant was armed and dangerous, thus warranting a frisk of his person. The Supreme Court's decision in *Mimms*, *supra*, permits police officers to order a motorist out of a car pursuant to a lawful stop for a traffic violation. After being detained for a traffic violation, however, an individual may be frisked only if there arises either an "articulable suspicion of criminal activity," *Terry*, *supra*, 392 U.S. at 21, 88 S.Ct. at 1879; *see also United States v. Bellamy*, 619 A.2d 515 (D.C.1993), or, a sufficient basis for a reasonable belief that the individual is "armed and dangerous." *In re D.E.W.*, *supra*, 612 A.2d at 194. *Mimms*, in no way, authorizes an "automatic frisk" with every traffic violation.[8] Hence, in consideration of the foregoing and the following, Officer Hernandez's frisk of appellant was unconstitutional.

The officers' fear for their safety is belied by the record testimony and by their own actions. Officer Hernandez testified that no reports of crime had been reported in the area. Further, he stated that he and the other officers were on a routine patrol. Moreover, no testimony was offered that the area of the stop was a high crime area; the officers had no prior knowledge of appellant, nor did appellant match any descriptions of persons suspected of any crimes; and, as expressly found by the trial court, appellant did not attempt to flee. Upon request, appellant furnished Officer Papricka with his license and registration.

Finally, if the officers feared for their safety, they certainly did not act in a manner suggesting apprehension of harm. Officers Hernandez and Papricka exited their car after stopping appellant's vehicle with their guns holstered; without their hands on their holsters; without calling for backup; without ordering appellant out of his car via the public address system; and, without even checking WALES[9] to determine if the car had been reported stolen or whether there were outstanding tickets or warrants for the vehicle or a look-out for this vehicle. Once they reached appellant's car, the officers conversed with him through an open window; did not instruct him to place his hands where they could see them; and allowed him to reach into the glove compartment of his car to retrieve his license and registration.

Rather than suggesting officers in fear of their safety, these actions by the officers are consistent with actions of reasonable police officers who have just stopped a routine traffic violator, not someone whom they had reason to believe was armed and dangerous.[10] Conversely, the *Green* court was per-

---

**8.** The frisk in *Mimms* was found to be constitutional because once the defendant exited his vehicle, the police officer observed a "large bulge under [the defendant's] jacket." Fearing that this bulge might be a weapon, the officer frisked the defendant and recovered a revolver. The Supreme Court in upholding the frisk stated that "[t]he bulge in the jacket permitted the officer to conclude that the defendant was armed and posed a danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted a pat-down." *Mimms*, *supra*, 434 U.S. at 112, 98 S.Ct. at 334.

**9.** *See Carter v. United States*, 614 A.2d 542, 543 n. 2 (D.C.1992) ("WALES, an acronym for Washington Area Law Enforcement System, is a computerized information network linking police departments and other law enforcement agencies throughout the Washington metropolitan area.").

**10.** The reader will recall that the trial court never addressed the "bending" or "ducking" testimony of Hernandez, either in the first instance or after remand. See page 1085, *supra*. At page 1094 of his opinion, Judge King states "[i]n my view, of the various factors considered by the trial court, the significance of [appellant's] ducking toward the passenger seat is paramount. It is that act, and only that act, in the circumstances presented here, that could reasonably give rise to the conclusion on the part of the officers that [appellant] might have armed himself." A fair reading of the transcript, over and over again, discloses no trial court findings— even after a remand of this case—of any "ducking" by appellant toward the passenger seat. Although this factor may be of paramount significance to Judge King, its paramount significance

suaded that a frisk was constitutional because "[t]he testimony of the officers and the precautionary action taken by them [*as credited by the trial court*] clearly indicate[d] their apprehension of harm." [11] *Green, supra,* 151 U.S.App.D.C. at 38, 465 F.2d at 623. Also, in *D.E.W.*, the officer, after observing D.E.W.'s furtive movements, drew his gun and ordered D.E.W. from the car. In contrast, in *Page, supra,* where this court found the frisk unconstitutional and the movement by the motorist was even less innocuous than the reaching movements in the present case, the police officers did not take any precautions before approaching the car.

■ Further, Officer Hernandez, at the time of the stop, was a rookie who had been on the police force for less than a year. Significantly, the more seasoned officer, Papricka, who had requested and received appellant's driver's license and registration from him, did not instruct appellant to place his hands on the car when he asked him to step out of the car; rather, Hernandez made the request. We view the events surrounding the stop and frisk "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Peay, supra,* 597 A.2d at 1322 (citations omitted). Thus, in examining the totality of the circumstances, I hold that the trial court did not give due weight to Hernandez's lack of experience. *See United States v. Briggman,* 931 F.2d 705, 709 (11th Cir.), *cert. denied,* 502 U.S. 938, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). In this regard, this court noted that the officer in *Johnson v. United States,* 350 A.2d 738, 739 (D.C.1976), had four-and-a-half years of experience and that his fear that the defendant may have been armed was reasonable given that he had "made arrests for finding weapons in

bags before." *Id.* at 739; *see also United States v. Bull,* 565 F.2d 869 (4th Cir.1977) (court noted that officer had long been engaged in investigating night-time burglaries and thus, stop and frisk was constitutional).

### V.

### Conclusion

■ In my view, a routine traffic violation, coupled with a slight hesitance on the part of the motorist does not establish reasonable suspicion that a person is armed and dangerous. Drawing all reasonable inferences in favor of sustaining the trial court's ruling does not, and in fact, **can not**, require this court to ignore the teachings of *Terry,* which require that a police officer point to "specific and articulable" facts to establish a reasonable suspicion to justify the frisking of a person.

While the requirement of reasonable suspicion is not "an onerous one," *Gomez v. United States,* 597 A.2d 884, 888 (D.C.1991), any decision sanctioning a frisk of appellant under the circumstances discussed herein would strike a serious blow to the body of the Fourth Amendment. As Judge Wright recognized in *Green,*

> a police officer unquestionably has the right and indeed the duty to take reasonable precautions to protect himself against potential danger. But as important as this interest may be, it is not absolute, for the officer's interest in self-protection must always be balanced against the often competing right of all persons to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment.

cannot be addressed *in the first instance* on appeal.

11. In *Green,* the officers observed the defendant run a stop sign. Before the car came to a halt, the officers observed the defendant make an arm movement in front of his body. Both officers believed the defendant was armed. As a result, the officers took the following precautions: (1) stopped the police vehicle one and one-half car lengths behind the defendant's car; (2) ordered the defendant out of the car and away from his car via the public address system; and (3) while

one officer approached the car, the officer remained standing beside the cruiser with one hand on the radio and the other on the on the butt of his revolver. *Green, supra* 151 U.S.App. D.C. at 36, 465 F.2d at 621. Thus, I strenuously disagree with Judge King's characterization of the facts in *Green* at page 1095 of his dissenting opinion as "virtually indistinguishable" from those in the present case. In making this characterization, Judge King confuses "found facts" with sweeping testimony not credited by, or otherwise addressed, by the trial court.

*Green, supra,* 151 U.S.App.D.C. at 41, 465 F.2d at 626.

Balancing these considerations in this case, the judgment of conviction must be reversed.[12]

FARRELL, *Associate Judge,* concurring in the judgment:

This is not a "disarmingly simple case," as Judge Sullivan opines, but it is one requiring us to do our fallible best to decide whether the police, viewing events though their perspective, had objective reason to suspect that appellant was armed, and therefore to frisk him.[1] The knife's edge of that decision, for me (and I believe for Judge King), is appellant's gesture while the police were pursuing him of "ducking" or "bending" toward the passenger side of the car. Without consideration of that fact, the evidence reveals that appellant breached several traffic regulations (not asserted, however, to be arrestable infractions) and was nervous and initially unresponsive (say even uncooperative) in furnishing his driver's license and registration. In the aggregate, that conduct was enough to allow the officers to order him out of the car while they checked his vehicle documents, did a WALES check, and issued him citations. It was also enough for them to direct him to keep his hands in view while detained. *See Cousart v. United States,* 618 A.2d 96, 101 (D.C.1992) (en banc).

But the additional, significantly greater intrusion of ordering him to place his hands on the car *and* patting him down[2] can be justified only if the sole additional fact present— appellant's earlier body movement before stopping—was sufficient to arouse a reasonable fear in the officers that he was armed.

Our decisions lead me to conclude that it was not. As Judge Sullivan points out, in *United States v. Page,* 298 A.2d 233 (D.C.1972), we held that "furtive movements" seemingly more sinister than appellant's were insufficient to justify a frisk. As in this case, the stop of the defendant's vehicle was for traffic violations, "without any indication of criminal activity either on the part of the driver or passengers." *Id.* at 237. While one officer was talking to the driver, another noticed that Page, a rear seat passenger, looked at the officers "and then moved his right arm and shoulder 'as if to hide something' or 'put something away, get something.'" *Id.* at 234. As an officer approached the car, Page "'still had his arm towards the back of his body.'" *Id.* Yet we held that these movements, illuminated by no other fact than the traffic violations resulting in the stop, did "not establish a reasonable basis for the frisk of [Page]." *Id.* at 237.

We distinguished *Page* in *In re D.E.W.,* 612 A.2d 194 (D.C.1992), because unlike "the ambiguous furtive movement" at issue there, the action observed by the officer in *D.E.W.* "appeared to him to be an unambiguous effort to conceal a weapon." *Id.* at 198. Specifically, the officer had seen the defendant "trying to 'shov[e] something down the front part of his pants' under his coat," then "'h[o]ld his hands over the area where he was pushing.'" *Id.* at 195. We held that action to be enough to tip the balance in favor of a lawful protective frisk.

The explicit movement in *D.E.W.* does not set a minimal standard for judging whether a particular bodily gesture could induce an officer's reasonable fear for his safety. Indeed,

---

12. Finally, Judge King states at page 1094 of his opinion that "[t]he trial judge observed Officer Hernandez when he testified, and concluded, based on that observation, as well as other factors, that it was not unreasonable for the officers to conclude that the purpose of [appellant's] 'ducking' was to obtain a weapon." I mean no disrespect to my colleague, however, no such conclusion appears in the record. If indeed, the officers had concluded that the "ducking" was to obtain a weapon, their actions in approaching the car, which I have detailed meticulously, see pages 1088–1089, *supra,* were totally inconsistent with that conclusion.

1. The Fourth Amendment permits an officer to "conduct a patdown to find weapons that he reasonably believes *or suspects* are then in the possession of the person he has accosted." *Ybarra v. Illinois,* 444 U.S. 85, 93, 100 S.Ct. 338, 343, 62 L.Ed.2d 238 (1979) (emphasis added).

2. *Compare Cousart,* 618 A.2d at 100 ("The officers did not touch the passengers...."). While in *Cousart* the police officers "confronted a car which had just been in flight from a fellow officer," *id.,* the judge in this case found "that there wasn't actually any kind of flight, or chase involved...."

in the current era of ubiquitous semi-automatic pistols, I think the movement of reaching and positioning one's arm near the rear of the body at issue in *Page* would arouse natural apprehension in a police officer, and probably allow a patting of the belt area of the person detained.[3] But under *Page* and *D.E.W.*, the ambiguous movement in this case cannot be the decisive fact justifying a frisk that was otherwise unwarranted. Although appellant looked in the rear view mirror at the pursuing police, the trial judge found that he was not attempting to evade them. He was then seen to duck or bend toward the passenger side of the car before stopping the vehicle a block or so later. By the time he was ordered out of the car, the police had let him search through the glove compartment for his registration,[4] and his hands were visible to them as he surrendered the documents and exited the car. The government does not argue that he was suspected of any other offense than the traffic violations.[5] I therefore agree that, without more, appellant's earlier bending movement (even calling it a reaching) was too weak an indication that he had armed himself to permit the additional intrusion of a frisk.

KING, *Associate Judge*, dissenting:

It appears to me that both Judge Sullivan and Judge Farrell are substituting their judgment for that of a trial judge who went to great lengths to put herself in the place of the police officers as she assessed the significance of the events observed by them in the early morning hours when the gun was recovered. The trial judge ruled that the police conduct was not unreasonable under the circumstances, there is more than adequate record support for that finding, and I would not disturb it.

### I.

At the suppression hearing Officer Juan Hernandez testified that on June 10, 1990, at approximately 3:40 a.m. he and Officers Papricka and Green were traveling eastbound in a police vehicle in the 300 block of Kennedy Street, N.W., when they observed a brown Toyota, approximately three or four car lengths in front of them, make an abrupt left-hand turn into an alley. There were no other vehicles between them and the Toyota. The abruptness of the turn caught the officers' attention and they also turned into the alley, following the Toyota. As they reached the midpoint of the alley the Toyota "was exiting [the alley] at a high rate of speed, and buckled onto Missouri Avenue" without stopping at the stop sign located at the end of he alley. Hernandez explained that "buckled" means the Toyota "bottomed out" when it made the right-hand turn onto Missouri Avenue. Officer Hernandez also observed that the Toyota must have accelerated while in the alley because the distance between the two vehicles had lengthened by a "few more" car lengths, i.e., the Toyota was about five or six car lengths ahead of the police vehicle when the Toyota exited the alley. As the police vehicle approached the end of the alley, the officers activated their emergency equipment, i.e., the lights and siren, and increased speed.

Both vehicles proceeded east on Missouri Avenue passing through the intersection at Third Street and a green light at the intersection at Kansas Avenue with the police officers "right behind him, hitting our siren and hitting our horn." At the Kansas Avenue intersection, the police vehicle was less than a half car length behind the Toyota. During this portion of the chase it "ap-

---

**3.** In the class of furtive movements permitting a frisk would also be included those in *McGee v. United States*, 270 A.2d 348, 349 (D.C.1970) (police saw defendant "reach down below the front seat ... toward the floorboard and apparently place something under the seat"), and *United States v. Green*, 151 U.S.App.D.C. 35, 38, 465 F.2d 620, 623 (1972) (police "observed the driver making furtive movements as though pulling something out of his belt and placing it under his seat").

**4.** The trial judge so found on remand.

**5.** Had the judge found that appellant's conduct in stopping only after several blocks exhibited "flight" from the pursuing police (and a corresponding "chase"), a reasonable inference might have been drawn of his awareness of guilt of some graver offense. But the judge did not find, nor does the government argue, that his actions bespoke someone, for example, engaged in possession of a stolen vehicle.

peared" to Officer Hernandez that the Toyota was exceeding the speed limit although that vehicle's speed was not actually clocked or otherwise measured.

The Toyota then made a left-hand turn back onto Kennedy Street, and, because that area is well lighted, Officer Hernandez was able to observe the driver looking at the officers in his rear view mirror. Officer Hernandez testified that he could see the driver "look at us in the rear view mirror, and duck down towards his passenger seat, and look at us again, he kept going through this [6]—second street." Officer Hernandez, however, could not see what, if anything, the driver was doing when he ducked toward the passenger seat. At that point "[w]e kept hitting our siren and stuff, and we started thinking this guy might try to run, he was obviously not stopping...." Finally, at the edge of the one hundred block of Kennedy Street the Toyota pulled over and stopped. The Toyota had traveled approximately two to three blocks before stopping after the emergency equipment was activated by the officers.

Hernandez walked to the passenger side of the Toyota and Officer Papricka went to the driver's side. Both officers had their weapons holstered. The driver, later identified as Powell, was the only occupant. Officer Papricka then asked Powell for his drivers license and registration; however, Powell did not comply with that request and instead inquired why he had been pulled over. Papricka again asked Powell to produce his license and registration stating that once Powell complied with the request Papricka would explain the reason for the stop. Powell again asked Papricka why he had been stopped; Papricka then opened the driver's side door and directed Powell to get out of the vehicle. According to Hernandez, Powell had not produced his license and registration when the order to exit the car was made by Papricka.

Hernandez testified that "at that point, I went around to Papricka's side of the car, in case something were to happen, because he was making us kind of nervous.... When I

went around the car, he was still sitting in his car." According to Hernandez, "Officer Papricka said, you are going to have to step out of the car, sir, so he kind of smirked and got out of the car, and I said, put your hands on the car here." Powell, however, did not immediately place his hands as directed: "he was really acting nervous, and kept turning around, what, why, what have I done, I said, put your hands on the car." Powell then complied, and Hernandez began a pat-down by going to Powell's waistband where he found a nine millimeter pistol. Hernandez testified he conducted the pat-down "[f]or our safety, for my safety, and my partner's safety, and for the defendant's safety." Hernandez conducted the pat-down because he was convinced that Powell might have some type of weapon on him.

Powell testified that he first noticed the police vehicle behind him while he was in the 400 block of Kennedy Street, N.W., and that there was one other vehicle between his and the police vehicle. When he turned into the alley the police vehicle was approximately one-half block behind him. He confirmed that he had taken the route described by Officer Hernandez, explaining that by cutting through the alley he would avoid stop-lights on Kennedy Street at the intersections of both Third Street and Kansas Avenue. He testified that this route was a common short-cut made by those familiar with the area. Powell disputed several aspects of the officer's testimony, however. For example he claimed the police car was just emerging from the alley when he approached the light at Kansas Avenue and that the emergency lights on the police car where not activated until he had turned back onto Kennedy Street. He also testified that neither the siren nor the horn on the police vehicle were activated. The only "reaching" he did was for his wallet just before he stopped his vehicle, and for the glove compartment after his vehicle had come to a stop. Finally, he testified that he pulled his vehicle to the curb within a half block of seeing the flashing lights.

---

**6.** The record does not reveal what the officer meant by his remark that Powell "kept going through this," or whether the testimony was, or was not, accompanied by gestures on the part of the officer.

After his vehicle was stopped, an officer approached on the driver's side and asked for his drivers license and registration. Powell testified he had his license in his hand and that he retrieved an envelope containing the registration from his glove compartment. He then gave the license and the envelope to the officer who then directed that he get out of the car.[7] A second officer took Powell to the rear of his vehicle while the first officer searched inside of the Toyota in the vicinity of the front seat. He was then ordered to place his hands on the car, and after he complied, the officer found the pistol on his person.

## II.

Powell concedes that the police, under *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), could properly order him out of the vehicle pursuant to a valid stop for a traffic violation. Powell challenges the subsequent frisk, however, claiming that the police lacked sufficient grounds to form a reasonable belief that he was armed and dangerous.

Our standard of review for a trial court's ruling on a motion to suppress tangible evidence requires that "the facts and all reasonable inferences therefrom must be viewed in favor of sustaining the trial court ruling."

*Peay v. United States*, 597 A.2d 1318, 1320 (D.C.1991) (en banc) (citations omitted). We have held that it is a "well settled principle that in the course of a lawful stop, a police officer may conduct a reasonable search for weapons for his own protection where he has reason to believe that he is dealing with an armed and dangerous individual." *In re D.E.W.*, 612 A.2d 194, 195 (D.C.1992) (internal quotations and citations omitted). "Moreover, the evidence of suspicion must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Id.* (internal quotations and citations omitted).

The trial judge, concluding that the police action was reasonable, set forth several factors that supported the officers' belief that their safety was in jeopardy. First, the judge found that the officers were reasonable in viewing Powell's detour through the alley, at 3:40 a.m., as unusual.[8] Second, "some time did pass before [Powell] stopped" in response to the police emergency equipment.[9] Third, Powell made reaching movements toward the passenger side of the car that the officers could have reasonably interpreted as an effort to locate the car registration or to obtain a weapon.[10] Fourth, the

7. On remand, the trial court found on this point that:

Powell did produce his driver's license and perhaps his registration to Officer Papricka before Powell was asked to step out of the car. But the Court also finds that Officer Papricka may well have not been aware of exactly what documents had been provided to him. In making these findings, the Court credits Powell's testimony that he was looking for his registration among the papers in his glove compartment. He retrieved an envelope which he believed contained his registration along with insurance documents and other papers. He attempted to find his registration in this envelope, but the officer was telling him to hurry up, and he therefore simply handed the entire envelope to the officer.

8. Judge Sullivan concludes that, since Powell testified that he, and others, often used the alley as a shortcut, the trial judge erred in concluding that his route that morning was an unusual one. The trial judge acknowledged that Powell's explanation for using that route was perfectly reasonable; however, it was also perfectly reasonable for the trial judge to find that, from the

officer's point of view, the route was in fact an unusual one particularly since the passage through the alley began with an "abrupt" turn and ended with Powell's vehicle "bottoming out" as it exited the alley.

9. Judge Farrell places weight on the trial courts finding that Powell was not attempting to evade the police. That finding, however, only binds us with respect to Powell's motivation. It does not enlighten on the question of how Powell's failing to promptly stop stop weighed in the minds of the police officers. Hernandez testified "we started thinking, this guy might try to run, he was obviously not stopping." As it should have been, it was the officers' assessment, not Powell's, that was taken into account by the trial judge.

10. We observed in *D.E.W., supra*, that the "issue is whether the officer had articulable suspicion [that the defendant was armed or had taken steps to arm himself], not whether [the defendant's] actions could be construed as innocent behavior." *In re D.E.W., supra*, 612 A.2d at 197 (citation omitted).

early morning hour was a factor that could be taken into account. Finally, the officers were entitled to consider the display of "hesitancy and nervousness on the part of [Powell]."

The trial judge acknowledged that hesitancy and nervousness are not unusual for people detained for traffic violations; however, the judge observed that "it is certainly not unreasonable for the officers to take that into account in determining whether or not they need to take some actions to protect themselves."[11] The trial judge concluded that when adding the nervousness and hesitancy of Powell to the other circumstances that preceded the stop, the officers were justified in frisking Powell "for their own safety." *See Peay, supra,* 597 A.2d at 1320 ("Even if each specific act by a suspect could be perceived in isolation as an innocent act, the observing police officer may see a combination of facts that make out an articulable suspicion.") (Internal quotations and citations omitted).

In my view, of the various factors considered by the trial court, the significance of Powell's ducking toward the passenger seat is paramount. It is that act, and only that act, in the circumstances present here, that could reasonably give rise to a conclusion on the part of the officers that Powell might have armed himself. There was no testimony that the "ducking" was accompanied by a reaching, but that is not at all surprising

since, any reaching by Powell from the bending position probably would not have been visible to the officers in the trailing vehicle. But drivers travelling at a high rate of speed through city streets do not duck down toward the passenger seat for no good reason. I submit that it cannot seriously be disputed, therefore, that such a movement could have been accompanied by a reaching, as the trial court found, that resulted in Powell gaining possession of a weapon. By the same token, it cannot seriously be disputed that such a movement could have been no more than an effort by Powell to obtain documents relating to his vehicle. The issue, however, is not whether Powell did obtain a weapon or whether the ducking had some innocent purpose; rather, the issue is whether under the circumstances it was unreasonable for the police officer to conclude that by that action Powell might have armed himself or caused a weapon to be readily available to him.

I hasten to note that the significance of the "ducking" factor does not make the other factors irrelevant; they gave context to, and flesh out, the perception by the officers of the significance of Powell's ducking movement. The trial judge observed Officer Hernandez when he testified, and concluded, based on that observation, as well as the other factors, that it was not unreasonable for the officers to conclude that the purpose of Powell's "ducking" was to obtain a weapon.[12] Trial judges have been instructed by

---

**11.** On remand the trial court elaborated:

The Court finds that through the stop, both before and after he was asked to step out of the car, Powell was asking questions about why he was being stopped. Powell complied with the demands of the officers that he produce his driver's license and registration, and that he place his hands on the car. However, his compliance was not immediate, and it was punctuated with his own demands to know why this was happening to him.

The Court did not find that there was anything particularly unusual about Powell's responses. Indeed, in [its ruling denying the motion to suppress], the Court stated that it probably was not unusual for people to be hesitant or nervous when they are stopped by the police. The Court believed, however, that it was reasonable for the officers to take these facts into account in deciding whether a frisk was warranted. The Court concluded that when considered from the point of view of the officers, these facts, in conjunction with the

hour, the unusual route, the failure to immediately respond to the emergency equipment, and the reaching movements prior to stopping the car, justified the "pat down" of the defendant.

**12.** *See United States v. Alexander,* 428 A.2d 42, 49–50 (D.C.1981) (noting that "in reviewing the court's findings in a motion to suppress, we must accept its resolution of conflicting testimony, and will not disturb the factual findings so long as they are supported by substantial evidence") (footnote omitted); *United States v. Briggman,* 931 F.2d 705, 709 (11th Cir.) ("In examining the totality of the circumstances, a reviewing court must give due weight to the officer's experience."), *cert. denied,* —— U.S. ——, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991). *See also Michigan v. Long,* 463 U.S. 1032, 1052, 103 S.Ct. 3469, 3482, 77 L.Ed.2d 1201 (1983) ( "[W]e stress that a Terry investigation ... involves a police investigation ... when the officer remains particularly vulnerable in part because a full custodial arrest

our cases to place themselves in the shoes of the police officer and to view the unfolding events at the scene as the officer would have. *See, e.g., Peay, supra,* at 597 A.2d at 1322. And the trial judge followed those instructions when she conducted the hearing in this case. On this record I am satisfied that the trial judge, viewing the police action "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *Peay, supra,* 597 A.2d at 1322 (citation omitted), could properly find that the officers had reasonable articulable suspicion that the Powell posed a safety risk and that it was reasonable to frisk him for a weapon. *Cousart v. United States,* 618 A.2d 96, 100 (D.C.1992) (en banc) (finding that record supported trial court's determination "that the officers reasonably perceived the circumstances as more than a mere traffic violation"); *see also Terry v. Ohio,* 392 U.S. 1, 33, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) ("There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet.") (Harlan, J., concurring).

Judge Sullivan finds comfort in remarks by Judge Wright in his dissenting opinion in *United States v. Green,* 151 U.S.App.D.C. 35, 465 F.2d 620 (1972). In that case, however, on facts virtually indistinguishable from the facts presented here, the majority held that the trial court did not err in denying the motion to suppress. In *Green,* as was true here, the police encountered a lone driver of a speeding vehicle in the early morning hours who ran a stop light and who at one point "leaned over." In neither *Green* nor in this case were the drivers hands visible, but in both cases the officers testified that they believed, as a result of the driver's actions, that he was armed. The *Green* court upheld the trial court's determination that the officers' fear that the driver was armed was not unreasonable. We should do the same in this case.

has not been effected, and the officer must make a quick decision as to how to protect himself and others from possible danger.").